CONCERNED CITIZENS OF CARDEROCK and Jack Anderson, Plaintiffs,

v.

Robert C. HUBBARD and Adat Shalom Reconstructionist Congregation, Defendants.

No. CIV. AMD 99–3266.

United States District Court, D. Maryland.

Feb. 1, 2000.

Stanley D. Abrams, Cathy Greenebaum Borten, Stanley, West & Storm, Bethesda, MD, Kevin N. Anderson, Salt Lake City, UT, for plaintiff.

Marc P. Hansen, Charles W. Thompson, Jr., Edward Barry Lattner, Clifford L. Royalty, Montgomery County Attorney's Office, Rockville, MD, for Robert C. Hubbard, defendant.

Jay P. Lefkowitz, Brett M. Kavanaugh, John F. Wood, Traci L. Jones, Laura Bach, Kirkland & Ellis, Washington, DC, for Adat Shalom Reconstructionist Congregation, defendant.

## MEMORANDUM

DAVIS, District Judge.

█ This is an Establishment Clause challenge to the constitutionality of a Montgomery County zoning ordinance.[1] Specifically, plaintiffs allege that Montgomery County Code, Chapter 59 (the "Ordinance"), amounts to an impermissible endorsement of religion because it designates "churches ... and other places of worship" as "permitted uses" within areas zoned for single-family residential use, and thereby exempts such uses from the special exception process, whereas "charitable or philanthropic institutions" and "private clubs" do not enjoy such an exemption.

Plaintiffs are Concerned Citizens of Carderock, an organization of homeowners, and Jack Anderson, a homeowner. Defendants are Robert C. Hubbard, the Director of the Department of Permitting Services for Montgomery County, who is sued in his official capacity, and Adat Shalom Reconstructionist Congregation, to which Hubbard issued a building permit authorizing the construction of a synagogue and related structures on a five acre parcel in the Bethesda area of Montgomery County. Plaintiffs seek declaratory and injunctive relief pursuant to 42 U.S.C. § 1983, including a declaration that the Ordinance is unconstitutional and an order revoking the building permit issued to Adat Shalom by Hubbard on the authority of the Ordinance.

Pending before the court are the defendants' motions to dismiss and plaintiffs' motion for a preliminary injunction. For the reasons explained below, I am persuaded that the Ordinance passes constitutional muster under the Establishment Clause. Accordingly, I shall grant the motions to dismiss and deny, as moot, the motion for a preliminary injunction.

## I

A complaint should not be dismissed for failure to state a claim under Fed.R.Civ.P. 12(b)(6) "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *accord Warth v. Seldin*, 422 U.S. 490, 501, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975); *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). Motions to dismiss for failure to state a claim are "granted sparingly and with caution in order to make certain that plaintiff is not improperly denied a right to have his claim adjudicated on the merits." 5A CHARLES A. WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE &

---

1. The Establishment Clause provides that "Congress shall make no law respecting the establishment of religion." U.S. Const. amend. I. First Amendment protection applies to state action as well as Congressional action. *See Schneider v. State of New Jersey*, 308 U.S. 147, 150, 60 S.Ct. 146, 84 L.Ed. 155 (1939); *Richmond Newspapers, Inc. v. Commonwealth of Virginia*, 448 U.S. 555, 598 n. 2, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980)(Stewart, J., concurring).

PROCEDURE, CIVIL 2D § 1349 at 192–93 (1990).

■ Rule 8(a)(2) requires only that a complaint include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a). A claimant is not required to "set out in detail the facts upon which he bases his claim" so long as the claim "will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley*, 355 U.S. at 47, 78 S.Ct. 99. Moreover, all well-pleaded factual allegations are assumed to be true and are viewed in the light most favorable to the plaintiff. *Jenkins v. McKeithen*, 395 U.S. 411, 421–22, 89 S.Ct. 1843, 23 L.Ed.2d 404 (1969). Only when the factual allegations in support of a claim are not well-pleaded (e.g., when they are "functionally illegible" or "baldly conclusory," *Shuster v. Oppelman*, 962 F.Supp. 394, 395 (S.D.N.Y.1997)), should they not be accepted as true and the claim dismissed.

Application of the above principles to the instant case compels the conclusion that the motions to dismiss should be granted.

## II

The essential material facts alleged in the complaint are undisputed. Concerned Citizens is a private, unincorporated association of property owners organized for civic and political activities, operated for the benefit of its members and not open to the general public, which its members formed with the specific intention of contesting Adat Shalom's plans to build its complex on property it purchased in plaintiffs' neighborhood. Concerned Citizens' members live adjacent to or in the immediate vicinity of the five acre property owned by Adat Shalom. On its property, Adat Shalom is constructing a complex which will include a 25,000 square foot structure, together with a 150 vehicle parking lot, and ultimately comprising a synagogue, a sanctuary, auditorium, social hall, commercial-sized kitchen, day care facilities, offices, and at least 12 classrooms.

The area of Bethesda in which the dispute has arisen is zoned RE–2, which permits single family houses on two acre lots. In addition to single-family homes on two acre lots, 40 other uses are "permitted uses" for RE–2 zones as specified in the challenged Ordinance.[2] Among these "permitted uses" are "churches ... and other places of worship." A property owner whose proposed project is covered by a permitted use is entitled to obtain a building permit from Hubbard's department so long as its plans conform to applicable zoning regulations, including height, set back, and density requirements.

The challenged Ordinance also designates 43 uses which will be permitted with-

---

**2.** Permitted uses include: bed and breakfast lodging with one or two guest rooms; embassy; farm tenant dwelling; farm tenant mobile home, one only; group home, small; guest houses, as accessory uses; guest rooms, for not more than two roomers in any dwelling unit; mobile homes, double-wide; registered living unit; electric power transmission and distribution lines, overhead, carrying 69,000 volts or less; electric power transmission and distribution lines, underground; parking of motor vehicles, off street, in connection with any use permitted in the zone; pipelines, underground; some public utility buildings, public utility structures, and telecommunications facilities; railroad tracks; telephone and telegraph lines; Christmas trees, sale of between December 5 and December 25; some types of transitory uses; adult foster care home; ambulance rescue squads, publicly supported; child care facility in family day care home; child care facility in group day care home; churches, memorial gardens, convents, monasteries and other places of worship; elderly day care facilities for not more than 4 individuals; fire stations, publicly supported; some types of home health practitioner's offices; home occupation, registered; home occupation, no impact; opportunity housing program; services that are publicly owned or publicly operated; respite home care; libraries and museums; park and playgrounds, publicly owned; swimming pools, private; agricultural uses; farm market; accessory buildings or structures for housing animals or fowl; accessory buildings and uses; kennels, noncommercial; signs in accordance with article 59–F. Mont. County Code § 59–C–1.31

in RE–2 residential zones only upon issuance of a permit for "Special Exception Use."[3] Among these uses are private clubs and charitable or philanthropic institutions. In order to obtain a building permit for a "Special Exception Use," a property owner must submit an application establishing that the proposed use will not have a detrimental impact on the neighborhood, as determined by consideration of a host of criteria, including: (1) harmony with the character of the other structures; (2) consistency with the overall plan for physical development of the area; (3) the use, peaceful enjoyment and economic value of surrounding properties; (4) the number, intensity and scope of special exception uses in the area; (5) the health, safety, security, morals or general welfare of residents, visitors or workers in the area; (6) the adequacy of public services and facilities such as police and fire protection, sewer, public roads and storm drainage; and, (7) the safety of pedestrian or vehicular traffic. *See* Mont. County Code, Chapter 59–G–1.21–22 (1994 ed., as amended). Before a "Special Exception Use" permit may be issued, a public hearing must be held, on notice, and a decision to grant such an exception must be in writing and must state the grounds for issuance. *Id.* at § 59–G.

Pursuant to the challenged Ordinance, Defendant Hubbard determined that Adat Shalom's proposed use was a "permitted use," i.e., a "place of worship," and issued

Adat Shalom a building permit on July 16, 1999, allowing it to commence construction of its proposed synagogue complex. Adat Shalom held a ground breaking ceremony at the site on September 25, 1999; plaintiffs filed this suit on October 28, 1999.

### III

#### A.

The Ordinance identifies "churches, memorial gardens, convents, monasteries, and other places of worship," along with 40 other categories of uses, as "permitted uses" in areas zoned RE–2 for single family residences. Montgomery County Code § 59–C–1.31. In passing the Ordinance, the County Council clearly reached a judgment that places of worship—like museums, libraries, adult foster care homes, family day care homes, publicly supported ambulance and rescue squads, publicly supported fire stations, publicly owned parks and playgrounds, private swimming pools, farm markets, and noncommercial kennels, § 59–C–1.31—are uses that presumptively are compatible with single family residential areas. Such "permitted uses" must still comply with all applicable zoning regulations, including set back, height and density requirements. *Id.*

By contrast, the County Council concluded that nursing homes, golf courses, country clubs, private clubs, hospitals, veterinary hospitals, private schools, charita-

---

**3.** Special Exception Uses include: accessory apartment; bed and breakfast lodging with 3, 4, or 5 guest rooms; farm tenant mobile homes for more than one but less than 4; group home, large; housing and related facilities for elderly or handicapped persons; life care facility; cable communications system; electric power transmission and distribution lines, overhead, carrying more than 69,000 volts; helistops; pipelines above ground; some public utility buildings, public utility structures, and telecommunications facilities; radio and television broadcasting stations and towers; antique shops; landscape contractor; retail nursery or garden center; some transitory use; wholesale nursery or greenhouse; ambulance or rescue squads, privately supported, nonprofit; animal boarding places;

cemetery; chancery; charitable or philanthropic institution; child care center; community redevelopment area; domiciliary care home for more than 16 residents; educational institutions, private; elderly day care facilities for more than four individuals; family burial sites; funeral parlor or undertaking establishments; some home health practitioner's offices; home occupation, major; hospice care facilities; hospitals; veterinary; nursing home; offices medical practitioners, for use by other than a resident of the dwelling; golf courses and country clubs; golf driving range; private clubs and service organizations; riding stables; swimming pools community; theater, legitimate; country market. Mont. County Code § 59–C–1.31

ble or philanthropic institutions, and child day care centers, among other uses, were presumptively not consistent with residential use and would be permitted in RE–2 zones only upon the grant of a Special Exception Use Permit. *See* § 59–C–1.3. Finally, the County Council prohibited altogether airstrips, commercial parking lots, motels, and outdoor catering facilities from such areas. *Id.*

Plaintiffs contend that the Ordinance unconstitutionally endorses religion by exempting "churches and ... other places of worship" from the Special Exception Use Permit application process while denying an exemption from that process to "private clubs" and "charitable or philanthropic institutions," which, plaintiffs point out, under the Ordinance, could permissibly be imbued with a religious purpose.[4] Thus, the gravamen of plaintiffs' challenge is that, absent the designation of "places of worship" as a permitted use, Adat Shalom would have been required to survive the gauntlet of the Special Use Permit process, just as private clubs and charitable and philanthropic institutions must. Plaintiffs contend that their inability to participate in such a process denies to them the opportunity to have input into the decision whether the Adat Shalom development should go forward, and they attempt to connect the occurrence of such an "injury" to an Establishment Clause violation.[5]

Complete comprehension of the plaintiffs' effort to connect their "injury" to an Establishment Clause violation is rather elusive. It appears that they have attempted to construct an argument along the following lines: "places of worship" are essentially "places where people assemble." Thus, the use to which a "place of worship" is ordinarily put is far more similar to those uses that might characterize non-exempt uses, such as theaters, than other exempt uses, such as museums and libraries, in which, presumably, people do not "assemble" but, one supposes, people merely "come and go." Consequently, according to plaintiffs' theory, the exemption afforded "places of worship" is actually *sui generis*. Accordingly, such a use amounts to a "class" or category of one which, because the class consists solely of an explicitly religious entity, the County Council is "endorsing" religion. Faithful adherence to settled Establishment Clause doctrine makes clear, however, that plaintiffs' contentions are unavailing.

### B.

■■■ The "core notion" animating the dictates of the Establishment Clause is that a "statute possess 'a secular legislative purpose' and that 'its principal or primary effect ... be one that neither advances nor inhibits religion.'" *Texas*

4. Section 59–A–2.1 defines a "charitable or philanthropic institution" as: "A private, nonprofit organization whose primary function is to provide either health, social, recreational, religious or benevolent services, or research or educational activities in areas of benefit to the public such as health, medicine or conservation of natural resources." A "private club" is defined as: "An incorporated or unincorporated association for civic, social, cultural, religious, literary, political, recreational or like activities, operated for the benefit of its members and not open to the general public." Mont. County Code § 59–A–2.1.

5. Defendants challenge the organizational standing of Concerned Citizens. As the Fourth Circuit explained in *Suhre v. Haywood County*, 131 F.3d 1083, 1085 (1997), "[l]ike others seeking the aid of the courts, Establish-

ment Clause plaintiffs satisfy Article III only when they demonstrate that they have suffered injury in fact that was caused by the conduct they challenge and is redressable by a judicial decision." I am satisfied that if plaintiffs have stated a claim, then the members of Concerned Citizens have suffered a cognizable though intangible injury of "being deprived of the opportunity to participate in the public zoning hearing which would be part of the special exception process" that Adat Shalom would be required to pursue absent the legislative designation of "churches ... and other places of worship" as a permitted use in a single-family residential area. *Renzi v. Connelly School of Holy Child*, 61 F.Supp.2d 440, 442 n. 1 (D.Md. 1999). Unquestionably, plaintiff Anderson has standing.

*Monthly, Inc. v. Bullock,* 489 U.S. 1, 9, 109 S.Ct. 890, 103 L.Ed.2d 1 (1989)(*quoting Lemon v. Kurtzman,* 403 U.S. 602, 612, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971)).[6] The Supreme Court has further explained:

> It does not follow, of course, that government policies with secular objectives may not incidentally benefit religion. The nonsectarian aims of government and the interests of religious groups often overlap, and this Court has never required that public authorities refrain from implementing reasonable measures to advance legitimate secular goals merely because they would thereby relieve religious groups of costs they would otherwise incur.

*Id.* at 10, 109 S.Ct. 890 (citations omitted).

### 1.

Defendants assert a secular purpose motivates the challenged zoning scheme: that it is meant to foster development which is harmonious and compatible with single family residential use. This is, indisputably, a secular purpose, since it is a valid (and common) zoning objective. *See Schultz v. Pritts,* 291 Md. 1, 432 A.2d 1319,

1330 (1981).[7] Plaintiffs' strained argument that other organizations (which, hypothetically, might share some of the goals of "places of worship"), are denied the benefits of the exemption from the special use permit process is insufficient as a matter of law to undermine the manifestly secular purpose of the Montgomery County zoning regime at issue here.

### 2.

■ To further determine whether a statute, like the Ordinance at issue here, which has a valid secular purpose, has a principal or primary religious effect, one looks to the neutrality of its application. Reviewing its Establishment Clause jurisprudence, the Supreme Court summarized:

> A central lesson of our decisions is that a significant factor in upholding governmental programs in the face of Establishment Clause attack is their neutrality towards religion .... We have held that the guarantee of neutrality is respected, not offended, when the government, following neutral criteria and evenhanded policies, extends benefits to recipients whose ideologies and view-

6. The Establishment Clause also prohibits statutes which foster "an excessive government entanglement with religion." *Lemon,* 403 U.S. at 612–13, 91 S.Ct. 2105. Consistent with its broad attack on the Ordinance, plaintiffs also contend that by allowing churches and other places of worship to forego the special use permit process the County Council fosters unnecessary government entanglement with religion. This contention is supported by the curious argument that defendant Hubbard has been forced to "advocate" the "rights" of Adat Shalom and to "defend" Adat Shalom's plans. These contentions are illogical and, in any event, badly misplaced. Hubbard had nothing to "defend" before plaintiffs filed suit and now, having been sued in his official capacity under § 1983, he is defending the County's legislative scheme, not the "rights" or "plans" of Adat Shalom, which of course is represented by its own counsel in this case. Ironically, it is the Ordinance's decidedly "hands off" policy toward places of worship that plaintiffs complain is too favorable toward religious institutions and thus violates the Establishment Clause of the First Amendment.

7. Defendants also identify as a secular purpose of the Ordinance the County Council's intent to avoid the unnecessary entanglement with religion that would be entailed by requiring churches and other places of worship to undergo the exacting special permit process. However, because the Ordinance's purpose in respect to the furtherance of harmonious uses in residential districts is a valid secular purpose, it is unnecessary for me to decide whether the County Council is *required* by the Establishment Clause to exempt churches from the special use permit process in order to avoid entanglement with religion. I note, however, that absent such an exemption as is challenged in the case at bar, there might certainly exist a valid concern under circumstances not presented in this case, which would be especially problematic in a case alleging discriminatory application of a special use permit application process burdening religions outside the mainstream. *See also Renzi,* 61 F.Supp.2d at 445–47.

points, including religious ones, are broad and diverse.

*Rosenberger v. Rector & Visitors of Univ. of Va.,* 515 U.S. 819, 839, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995) (citations omitted). Indeed, it is unconstitutional for government entities to exclude religious entities from public benefits because of their religious nature. *Id.* (university prohibited from paying for printing of student newspapers, but refusing to print qualified student religious newspapers because they were religious in content); *and see id.* at 861 (Thomas, J., concurring)("The Clause does not compel the exclusion of religious groups from government benefits programs that are generally available to a broad class of participants.").

To determine whether a law is neutral toward religion, the "critical question" is "whether the circumference of legislation encircles a class so broad that it can be fairly concluded that religious institutions could be thought to fall within the natural perimeter." *Walz v. Tax Commission of New York City,* 397 U.S. 664, 696, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970)(Harlan, J., concurring). Thus, a law is clearly neutral when it confers a benefit "upon a wide array of nonsectarian groups as well as religious organizations ...." *Bullock,* 489 U.S. at 14, 109 S.Ct. 890.

Based upon these principles, the Supreme Court declined to strike down as an unconstitutional endorsement of religion a state law exempting religious institutions from property taxes in *Walz v. Tax Commission of City of New York,* 397 U.S. 664, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970). The *Walz* Court found the law in that case neutral toward religion because the legislature had "granted exemption to all houses of religious worship within a broad class of property owned by nonprofit, quasi-public corporations which include hospitals, libraries, playgrounds, scientific, professional, historical, and patriotic groups." *Id.* at 673. Plaintiffs' effort in this case to distinguish *Walz,* on the ground that some "private clubs" might, hypothetically, be founded on religious interests, and that therefore the class of permitted uses is drawn too narrowly around "places of worship," is unpersuasive.

Plaintiffs' contentions to the contrary notwithstanding, a cursory review of the Ordinance at issue in this case reveals it to be clearly neutral toward religion. It grants a benefit (exemption from the special exception use permit process) to a wide array of "nonsectarian [uses] as well as religious [uses] ...," *Bullock,* 489 U.S. at 14, 109 S.Ct. 890, consistent with its purpose of preserving single family residential neighborhoods. The Ordinance envelops a broad circle of beneficiaries designating some 41 categories of permitted uses in the RE–2 zone, into which "churches ... and other places of religious worship" naturally fit.

A reasonable legislator would likely view libraries, museums, adult foster care homes, family day care homes, publicly supported ambulance and rescue squads, publicly supported fire stations, publicly owned parks and playgrounds, private swimming pools, farm markets, and noncommercial kennels as compatible with single family residential areas. All such uses offer services or amenities that people often want close to their homes, their families and their domestic pets. It is certainly also reasonable to presume that "churches ... and other places of worship" properly belong among this category of uses as wholly compatible with single family home life.

Indeed, the fact that some potentially religious uses must obtain Special Permits in order to locate in the RE–2 zone is a powerful indicator of the essential neutrality toward religion inherent in this zoning scheme. Private clubs and philanthropic organizations which are religious in nature, like their secular cohorts, and other nonexempt uses, must obtain Special Exception Use permits. Thus, the operative characteristic in the Ordinance is not religion, non-religion or any particular system of beliefs, but the County Council's reason-

able, and thus legitimate, judgment about presumed compatibility with single family residential use. *See Schultz*, 432 A.2d at 1330. This view of the Ordinance rests on a firm jurisprudential foundation. *See generally* E.C. Yokley, *Zoning Law and Practice* § 35–14, at 35 (4th ed.1980, Supp. 1999)("Since the advent of zoning, churches have been held proper in residence districts."); *Murray v. Comptroller of the Treasury*, 241 Md. 383, 216 A.2d 897, 909 n. 6 (1966)("In Maryland, zoning laws generally permit the building of houses of worship in a residential zone without application for variance or special exception.").

### C.

Finally, the conclusion reached here is not inconsistent with Chief Judge Motz's recent decision in *Renzi*, on which plaintiffs heavily rely. In *Renzi*, the court struck down as unconstitutional on Establishment Clause grounds a Montgomery County zoning provision which exempted from the special exception process any private or parochial school located on property *owned or leased by a religious organization;* in contrast, a private or parochial school wishing to locate on property *owned by a non-religious organization* had to obtain a special exception. *See* 61 F.Supp.2d. at 447–48. The operative fact that determined whether the special exception process was required was the religious or secular nature of the owner of the property on which the school sought to locate. *That is, the operative characteristic was religion. Id.*

### IV

Because the Ordinance has a valid secular purpose and achieves genuine neutrality toward religion, it does not violate the Establishment Clause of the First Amendment. Thus, when Defendant Hubbard issued a building permit to Adat Shalom without requiring a Special Exception Use Permit, he acted under the authority of a law that is consistent with the Establish-

ment Clause, and he did not violate plaintiffs' rights in doing so. Accordingly, I shall grant the motions to dismiss.