# United States Court of Appeals
## For the First Circuit

_____

No. 99-1760

MARGARET BOYAJIAN, CHARLES COUNSELMAN AND
JEAN DICKINSON,
Plaintiffs, Appellants,

v.

THOMAS GATZUNIS, BUILDING INSPECTOR OF THE
TOWN OF BELMONT; JOHN W. GAHAN III; AS MEMBER
OF THE ZONING BOARD OF APPEALS OF THE TOWN OF BELMONT;
WILLIAM D. CHIN, AS MEMBER OF THE ZONING BOARD OF
APPEALS OF THE TOWN OF BELMONT; THOMAS P. CALLAHAN, JR.,
AS MEMBER OF THE ZONING BOARD OF APPEALS OF THE
TOWN OF BELMONT; CARLO TAGARIELLO, AS MEMBER OF THE
ZONING BOARD OF APPEALS OF THE TOWN OF BELMONT;
ANTHONY LECCESE, AS MEMBER OF THE ZONING BOARD
OF APPEALS OF THE TOWN OF BELMONT; JAMES D. HARRINGTON,
AS MEMBER OF THE ZONING BOARD OF APPEALS OF THE
TOWN OF BELMONT; CHARLES H. REARDON, AS MEMBER OF
THE ZONING BOARD OF APPEALS OF THE TOWN OF BELMONT;
KARL TOBIASON, AS MEMBER OF THE ZONING BOARD OF
APPEALS OF THE TOWN OF BELMONT; CORPORATION OF THE
PRESIDING BISHOP OF THE CHURCH OF LATTER DAY SAINTS;

Defendants, Appellees.

_____

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Douglas P. Woodlock, U.S. District Judge]

_____

Before

Torruella, Chief Judge,

Coffin, Senior Circuit Judge,

and Boudin, <u>Circuit Judge</u>.

_____

    <u>G. Michael Peirce</u>, with whom <u>Mofenson & Nicoletti</u>, <u>Mark A. White</u>, <u>R. Keith Partlow</u> and <u>O'Brien, Partlow & White, P.C.</u> were on brief, for appellants.

    <u>Paul Killeen</u>, with whom <u>Edward J. Naughton</u>, <u>Daniel K. Hampton</u> and <u>Holland & Knight LLP</u> were on brief, for appellee Corporation of the Presiding Bishop of the Church of Jesus Christ of Latter-Day Saints.

    <u>David C. Hawkins</u> and <u>Morrissey & Hawkins</u> for appellee Town of Belmont.

    <u>Thomas F. Reilly</u>, Attorney General of Massachusetts and <u>LaDonna J. Hatton</u>, Assistant Attorney General, on brief for Commonwealth of Massachusetts, amicus curiae.

    <u>James O. Fleckner</u>, <u>Mark A. Michelson, P.C.</u> and <u>Choate, Hall & Stewart</u> on brief for American Jewish Congress, amicus curiae.

    <u>Wilson D. Rogers, Jr.</u>, <u>Law Offices of Wilson D. Rogers, Jr., P.C.</u>, <u>Frederic J. Torphy</u>, <u>James F. Cosgrove</u>, <u>Cosgrove, O'Connell & Blatt</u> <u>John J. Egan</u>, <u>Egan, Flanagan & Cohen, P.C.</u> and <u>Gerald D'Avolio</u> on brief for the Roman Catholic Archbishop of Boston, the Roman Catholic Bishop of Fall River, the Roman Catholic Bishop of Worcester, the Roman Catholic Bishop of Springfield and the Massachusetts Catholic Conference, amici curiae.

    <u>Gerald J. Caruso</u>, <u>Ferriter Scobbo Caruso & Rodophele PC</u>, <u>Devra G. Bailin</u> and <u>Urbelis, Fieldsteel & Bailin LLP</u> on brief for American Baptist Churches of Massachusetts, American Baptist Churches in the USA, Baptist General Conference, Baptist Joint Committee, Evangelical Covenant Church, Evangelical Lutheran Church in America, General Conference of Seventh-Day Adventists, General Counsel on Finance and Administration of the United Methodist Church, Presbyterian Church (U.S.A.), Reorganized Church of Jesus Christ of Latter Day Saints, United House of Prayer for all People of the Church on the Rock of the Apostolic Faith, Worldwide Church of God and the First Church of Christ, Scientist, amici curiae.

_____

May 2, 2000

_____

**COFFIN, <u>Senior Circuit Judge</u>.** This case involves a constitutional challenge under the Establishment Clause of the First Amendment to a state law and a town ordinance that prohibit municipal authorities from excluding religious uses of property from any zoning area. It is brought by a group of residents of Belmont, Massachusetts, against Belmont officials and the Church of Jesus Christ of Latter-Day Saints, challenging the construction of a large temple on the edge of a residential district in the town. The district court upheld both provisions of law, granting summary judgment for defendants and allowing construction to proceed. We affirm.

## I.  <u>Background</u>

The essential facts of this case are undisputed and were submitted to the district court with cross-motions for summary judgment. We draw our summary primarily from the district court's opinion, supplementing with details from the decision of the Belmont Zoning Board of Appeals and other pertinent record materials.

Defendant Corporation of the Presiding Bishop of the Church of Jesus Christ of Latter-Day Saints (the "Church" or "LDS") acquired an 8.9-acre parcel of land in the Town of Belmont in 1979. It constructed a meeting house on the property, which is located entirely in a single residential district, and has conducted religious services there since the mid-1980s.

The Church later decided to build a temple on the site. An LDS temple is a large facility, of which there are fewer than 100 worldwide, that is used solely for the Church's most sacred ceremonies. Although Belmont's zoning by-law permits religious uses as of right in residential districts, see By-law § 3.3, the Church filed an application for a special permit, as required, because it sought to exceed the allowable height limit.

After a series of public hearings in which opponents raised a variety of concerns, the Zoning Board of Appeals in 1997 approved the special permit. The Church voluntarily made numerous design changes in response to neighborhood concerns and obtained unanimous approval of its new design from the Board before it began construction. The final plans call for the temple to occupy some 69,000 square feet and to include one 139-foot-tall spire and several smaller towers.[1] The temple will be set back from abutters by at least 165 feet, and in most locations more than that, although plaintiffs are quick to point out that the setback will consist largely of a parking lot for over two hundred vehicles.

The Belmont by-law allowing religious uses by right in the residential zone where the Church's property is located is in accordance with Mass. Gen. Laws ch. 40A, § 3, known as the "Dover

[1] The original plan called for six spires exceeding the standard permissible height limitation and a surface area of 94,100 square feet.

Amendment."  That law provides, in part, that a zoning regulation may not restrict the use of land for religious or educational purposes when the property is owned by the Commonwealth, a religious organization, or a nonprofit educational corporation, except that "reasonable regulations" are permitted concerning such characteristics as the bulk and height of structures, open space, and parking.

Plaintiffs brought this suit challenging both Belmont's by-law and the Dover Amendment, claiming that they violate the Establishment Clause of the First Amendment by favoring religious uses of property without a secular purpose.  The district court granted summary judgment for the defendants in May 1999, finding that neither of the laws constitutes an impermissible "establishment" of religion.  Plaintiffs then filed this timely appeal.

## II. Discussion

The First Amendment to the United States Constitution states that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof," a proscription that has been extended to the States by virtue of the Fourteenth Amendment.  As the Supreme Court long has recognized, "tension inevitably exists between the Free Exercise and the Establishment Clauses," Committee for Pub. Educ. & Religious Liberty v. Nyquist, 413 U.S. 756, 788 (1973) (citing Everson v. Board of Educ., 330 U.S. 1 (1947) and Walz v. Tax Comm'n of

-5-

City of New York, 397 U.S. 664 (1970)), and the Court has "struggled to find a neutral course between [them]," Walz, 397 U.S. at 668. While the Free Exercise Clause admonishes the government against impinging on the religious beliefs and expression of its citizens, the Establishment Clause cautions that the government may not adopt the cause of religion as its own. The Seventh Circuit has noted the challenge of reconciling the two Religion Clauses:

> The juxtaposition of the two clauses, and the internal tension they create, makes total separation between religion and government impossible. Lynch [v. Donnelly, 465 U.S. 668, 673 (1984)]; Lemon [v. Kurtzman, 403 U.S. 602, 614 (1971)]. Indeed, "[i]t has never been thought either possible or desirable to enforce a regime of total separation" between religion and government. [Committee for Pub. Educ. & Religious Liberty v. Nyquist, 413 U.S. 756, 760 (1973).] Thus the Court has recognized that the First Amendment "affirmatively mandates accommodation," Lynch, 465 U.S. at 673, and "that the government may (and sometimes must) accommodate religious practices and that it may do so without violating the Establishment Clause." Hobbie v. Unemployment Appeals Comm. of Florida, 480 U.S. 136, 144-45 (1987) (footnote omitted).

Cohen v. City of Des Plaines, 8 F.3d 484, 491 (7th Cir. 1993); see Corporation of the Presiding Bishop of the Church of Jesus Christ of Latter-Day Saints v. Amos, 483 U.S. 327, 334 (1987) (quoting Hobbie, 480 U.S. at 144-45); Zorach v. Clauson, 343 U.S. 306, 312 (1952) ("The First Amendment . . . does not say that in every and all respects there shall be a separation of Church and State."). Our task in navigating the course between the opposing mandates of the Religion Clauses is thus to strike that appropriate balance referred to by the Court as a

"benevolent neutrality," Walz, 397 U.S. at 669; see also Amos, 483 U.S. at 334.

As a practical framework for analysis in cases such as this, the Supreme Court has adopted the three-part test articulated in Lemon v. Kurtzman, 403 U.S. 602, 612-13 (1971), which states that a law does not violate the Establishment Clause if (1) it has a secular legislative purpose, (2) its principal or primary effect neither advances nor inhibits religion, and (3) the statute does not foster excessive government entanglement with religion. See, e.g., Amos, 483 U.S. at 335-39; Rojas v. Fitch, 127 F.3d 184, 187 (1st Cir. 1997). The parties generally agree that the third requirement is satisfied in this case, so we will focus, as the parties have done, on the purpose and effects inquiries. Because the state statute (the Dover Amendment) effectively requires municipalities to enact by-laws like that adopted by Belmont, our conclusion that the Dover Amendment is constitutionally permissible largely resolves the lawfulness of the ordinance as well. We therefore discuss the ordinance only briefly in section B, infra.

A. The Dover Amendment

Section 3 of Chapter 40A of the Massachusetts General Laws limits the zoning regulations that can be imposed on certain types of land uses, including agriculture, religious use of property owned by either the Commonwealth or a religious group, nonprofit educational uses, child care facilities, access for physically handicapped persons to

private property, solar energy systems, and antennas for federally
licensed amateur radio operators.  The zoning of religious and
educational uses is addressed in the second paragraph of the section
and reads, in pertinent part, as follows:

> No zoning ordinance or by-law shall . . . prohibit,
> regulate or restrict the use of land or structures for
> religious purposes or for educational purposes on land owned
> or leased by the commonwealth or any of its agencies,
> subdivisions or bodies politic or by a religious sect or
> denomination, or by a nonprofit educational corporation;
> provided, however, that such land or structures may be
> subject to reasonable regulations concerning the bulk and
> height of structures and determining yard sizes, lot area,
> setbacks, open space, parking and building coverage
> requirements.

Mass. Gen. Laws ch. 40A, § 3.[2] This provision is commonly known as the

Dover Amendment because its religion-focused component was enacted in

1950 in response to a zoning by-law passed by the town of Dover,

Massachusetts, prohibiting religious schools within that town's

residential neighborhoods.  See Trustees of Tufts College v. City of

Medford, 415 Mass. 753, 757-58, 616 N.E.2d 433, 437-38 (1993); Attorney

General v. Dover, 327 Mass. 601, 603-04 (1951); The Bible Speaks v.

---

[2] Other paragraphs of section 3 detail similar limitations on the zoning
of other types of uses.  The first paragraph, for example, bars
unreasonable regulation of the use of land "for the primary purpose of
agriculture, horticulture, floriculture, or viticulture."  The third
paragraph prohibits local laws limiting the use of land or structures
for child care facilities, except for the same types of "reasonable
regulations" permissible with respect to religious and educational
uses. Also included in section 3 is a provision protecting congregate
homes for the disabled from discriminatory health and safety laws or
land-use requirements and a prohibition against unreasonable regulation
of solar energy systems.  See Mass. Gen. Laws ch. 40A, § 3.

-8-

Board of Appeals of Lenox, 8 Mass. App. Ct. 19, 28, 391 N.E.2d 279, 284 (1979).[3] The protections for other types of uses were added in later years.

Plaintiffs maintain that giving religious organizations the advantage of preferred zoning status constitutes an impermissible endorsement of religion, in violation of the Establishment Clause. Under Lemon, our first step in evaluating the Dover Amendment's constitutionality is to ascertain whether it serves a "secular legislative purpose." See Lemon, 403 U.S. at 612.

> This does not mean that the law's purpose must be unrelated to religion – that would amount to a requirement "that the government show a callous indifference to religious groups," Zorach v. Clauson, 343 U.S. 306, 314 (1952).

Amos, 483 U.S. at 335. We think the purpose of the Dover Amendment fits easily within the established boundaries of "benevolent neutrality," see id. at 334, in which religious exercise is supported but not promoted.

There is no dispute that the law was enacted to prevent religious discrimination of the sort embodied in the Dover by-law, which allowed

---

[3] In 1950, the Massachusetts Legislature inserted the following language into Mass. Gen. Laws ch. 40, § 25, a predecessor of the current ch. 40A, § 3:

> No by-law or ordinance which prohibits or limits the use of land for any church or other religious purpose or which prohibits or limits the use of land for any religious, sectarian or denominational educational purpose shall be valid.

secular educational institutions but barred sectarian ones in the town's residential areas. Indeed, the provision was originally titled "An Act Prohibiting Discriminatory Zoning By-laws and Ordinances." See Tufts College, 415 Mass. at 757, 616 N.E.2d at 437-38 (purpose of the Amendment was "to strike a balance between preventing local discrimination against an educational [or religious] use . . . and honoring legitimate municipal concerns that typically find expression in local zoning laws"). Prohibition of religious discrimination is unquestionably an appropriate, secular legislative purpose. See, e.g., Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520, 532 (1993) ("Indeed, it was 'historical instances of religious persecution and intolerance that gave concern to those who drafted the Free Exercise Clause.'"); cf. Walz, 397 U.S. at 673 (noting, in case challenging property tax exemption for religious uses of property, that "[g]overnments have not always been tolerant of religious activity" and that "[g]rants of exemption historically reflect the concern of authors of constitutions and statutes as to the latent dangers inherent in the imposition of property taxes").

Appellants do not dispute the legitimacy of protecting religious entities from discrimination, but they argue that the Dover Amendment goes unconstitutionally beyond such a purpose to endorse and benefit religious uses by removing "any type of real local zoning control of religious sites" (emphasis in appellants' brief). This argument

brings us to the second <u>Lemon</u> prong, which examines whether, irrespective of the government's actual purpose, the practice under review has the "principal or primary effect" of endorsing or disapproving religion, <u>Wallace</u> v. <u>Jaffree</u>, 472 U.S. 38, 55 (1985) (quoting <u>Lemon</u>, 403 U.S. at 612). Appellants maintain that the statute provides such a substantial advantage to religious institutions that, in effect, it constitutes an advancement of religion in violation of the Establishment Clause.

We note as an initial matter that a law that simply protects religious organizations from unfair treatment certainly cannot be impermissible as an unconstitutional endorsement of religious activity. See generally <u>Wisconsin</u> v. <u>Yoder</u>, 406 U.S. 205, 220-21 (1972) (The Establishment Clause "cannot be allowed to prevent any exception" to laws of general applicability which fosters the free exercise of religion.). Yet, it is possible for government to extend itself so far in preventing unfairness that it crosses the line from acceptable accommodation to impermissible favoritism. See <u>Amos</u>, 483 U.S. at 334-35 ("At some point, accommodation may devolve into `an unlawful fostering of religion . . . .'") (quoting <u>Hobbie</u>, 480 U.S. at 145)); <u>Yoder</u>, 406 U.S. at 220-21.

Although the precise location of that threshold can be difficult to detect, we are confident that it has not been reached here. Appellants' depiction of the statute as an impermissible legal hammer

-11-

wielded in favor of religion both grossly exaggerates the reach of the statute and understates the recognition that religion may be given consistent with the Establishment Clause.  As for the statute's scope, it does not exempt religious property uses from substantial standard zoning requirements that are designed to ensure compatible uses of land.  As earlier noted, the statute explicitly states in a proviso that limitations imposed on other property owners concerning such specific features as the bulk and height of structures, lot area, setbacks and required parking also may be imposed on religious organizations.  See ch. 40A, § 3.  Thus, a religious institution, no less than any other group, must comply with reasonable regulations designed to preserve a comfortable, desirable community.  See Tufts College, 415 Mass. at 760, 616 N.E.2d at 439 ("[T]he Dover Amendment is intended to encourage `a degree of accommodation between the protected use . . . and matters of critical municipal concern . . . .'").[4]

As for the statute's assertedly improper focus on religion, plaintiffs err in two respects: the statute does not benefit only

---

[4] We recognize that facially neutral restrictions imposed under the proviso may be subject to challenge as "unreasonable" if they effectively would nullify a religious or other permitted use.  See Trustees of Tufts College v. City of Medford, 415 Mass. 753, 757-58 & n.6, 616 N.E.2d 433, 437-38 & n.6 (1993).  The Massachusetts Supreme Judicial Court has stated that the question of reasonableness will depend on the particular facts of each case, see 415 Mass. at 759, 616 N.E.3d at 438, with the burden on the institution to "prov[e] that the local requirements are unreasonable as applied to its proposed project," 415 Mass. at 759,  616 N.E.2d at 439.

religious uses and, even if it did, such unique treatment can withstand constitutional scrutiny.

We look first at the statute's coverage. While the original Dover Amendment was directed solely at religious uses of property, the provision now includes a variety of uses linked together by the legislature's apparent judgment that these uses, though important to all communities, would be at risk of exclusion from certain zoning areas because of local prejudice unrelated to their compatibility with the essential nature of the existing community. Our task is to consider the validity of the statute before us, not the one enacted fifty years ago.  See generally Walz, 397 U.S. at 688 n.8 ("The only governmental purposes germane to the present inquiry . . . are those that now exist.").

It has long been accepted that religious entities may be the beneficiaries of laws that, for secular reasons, provide benefits to a variety of groups. See Texas Monthly, Inc. v. Bullock, 489 U.S. 1, 10-13 (1989) (plurality opinion); Rojas, 127 F.3d at 188-89.  Among the most prominent examples are the exemption from property taxes upheld by the Supreme Court in Walz, 397 U.S. at 664, and the tax deduction for the expenses of religious education allowed in Mueller v. Allen, 463 U.S. 388 (1983).  In his concurrence in Walz, Justice Brennan observed that New York included churches within the exempted class "not because it champions religion per se but because it values religion among a

variety of private, nonprofit enterprises that contribute to the diversity of the Nation."  <u>Walz</u>, 397 U.S. at 693.

We think an equivalent description applies to the state's judgment here.  In protecting religious, educational, agricultural and the other listed uses of property from exclusion -- whether  resulting from discrimination or simply from a general aversion to change in the neighborhood -- Massachusetts evidences "an affirmative policy that considers these groups as beneficial and stabilizing influences in community life," wherever they are located, <u>see</u> <u>id.</u> at 673.  The Supreme Court has time and again made it clear that to include religion in such a category is not to advance religion in contravention of the Establishment Clause.  The collection of favored uses in the Dover Amendment is amply diverse in the context of zoning to support such a determination.  <u>See</u> <u>Texas Monthly</u>, 489 U.S. at 15  ("How expansive the class of exempt organizations or activities must be to withstand constitutional assault depends upon the State's secular aim in granting a tax exemption.").

Turning to our second point regarding the statute's focus on religion, we note that even a special status granted exclusively to religious organizations is not always impermissible.  This conclusion is inevitably drawn from our analysis of three of the Supreme Court's more recent Establishment Clause cases.  All address benefits that were granted only to religious groups or solely on the basis of religion.

–**14**–

One upholds the benefit granted, while the other two invalidate the statutes at issue. Their holdings are instructive, for we see this case as governed by the former and easily distinguishable from the latter.

In Amos, the Supreme Court upheld section 702 of the Civil Rights Act of 1964, which exempted religious organizations from Title VII's prohibition against discrimination in employment on the basis of religion. See 483 U.S. at 327. Noting the Court's longstanding recognition that "`government may (and sometimes must) accommodate religious practices and that it may do so without violating the Establishment Clause,'" id. at 334 (quoting Hobbie, 480 U.S. at 144-45), the Court endorsed state efforts "to alleviate significant governmental interference with the ability of religious organizations to define and carry out their religious missions," id. at 335. The Court declined to invalidate the exemption on the basis that it singled out religious groups for a benefit, stating that where "government acts with the proper purpose of lifting a regulation that burdens the exercise of religion, we see no reason to require that the exemption comes packaged with benefits to secular entities." Id. at 338.

Massachusetts' effort to eliminate local zoning discrimination is fully in line with the Court's approval of government actions aimed at lifting burdens from the exercise of religion. Not only was the Dover Amendment at its origin a defensible response to an actual incident of

discrimination, but protections against land use bias continue to be supportable fifty years later. Two recent law review articles canvassing discrimination against religion in the land use context report numerous instances of zoning actions that reflect local sentiments ranging from outright hostility to indifference to the needs of religious organizations, with minority religions particularly hard hit. See Douglas Laycock, "State RFRAs [Religious Freedom Restoration Acts] and Land Use Regulation," 32 U.C. Davis L. Rev. 755, 771, 778-80 (1999) [hereinafter "State RFRAs"][5]; Von G. Keetch & Matthew K. Richards, "The Need for Legislation to Enshrine Free Exercise in the Land Use Context," 32 U.C. Davis L. Rev. 725, 729-30 (1999).

Of particular note is the phenomenon of churches being unwanted either in residential areas – because of increased traffic or noise, or impact on aesthetics – or in business zones – because tax-exempt churches dampen the vibrancy of commercial developments. See "State RFRAs," 32 U.C. Davis L. Rev. at 761-62, 774-75; see also, e.g., Christian Gospel Church v. San Francisco, 896 F.2d 1221, 1224 (9th Cir. 1990) (upholding denial of permit for church to hold worship services in residential neighborhood, noting that zoning "protects the zones' inhabitants from problems of traffic, noise and litter") (citation omitted); Cornerstone Bible Church v. City of Hastings, 948 F.2d 464,

_____

[5] Indeed, Professor Laycock notes that churches are now facing more difficulty in the land use context than in the past. See "State RFRAs," 32 U.C. Davis L. Rev. at 764.

467 (8th Cir. 1991) (quoting city council resolution excluding churches from the town's central business district because "no business or retail contribution or activity is generated"). Certainly in the face of such evidence, the state's decision to give religion an assist in the local land-use planning process is consistent with the Supreme Court's holding in Amos that legislation isolating religious groups for special treatment is permissible when done for the "proper purpose" of alleviating a burden on the exercise of religion. See Amos, 483 U.S. at 337-38.

Neither of the Court's two other cases, both of which struck down benefits given exclusively for religious reasons, points to a contrary result in this case. In Estate of Thornton v. Caldor, 472 U.S. 703 (1985), the Court invalidated a Connecticut statute guaranteeing employees the right to take their chosen Sabbath day off from work. The Court noted that the "absolute and unqualified right" given to Sabbath observers required employers to conform their business practices to an employee's religious practices without any "consideration as to whether the employer has made reasonable accommodation proposals," see id. at 709-10, conveying a message of "endorsement of a particular religious belief, to the detriment of those who do not share it," id. at 711 (O'Connor, J., concurring).

As we have observed, the Dover Amendment does not give religious organizations an "absolute and unqualified right" to build whatever

-17-

structures they desire in residential or other zones.  The protection given religious uses is moderated by the community's countervailing interest in minimizing adverse impacts to communities, which is reflected in the requirement that religious uses conform to the standard physical limitations imposed on all buildings located in that zone.  Moreover, in a further distinction from the Connecticut statute, the Dover Amendment does not protect one type of religious activity, but "extends . . . to all religious beliefs and practices," Thornton, 472 U.S. at 712 (O'Connor, J., concurring).  We think it clear, therefore, that "an objective observer would perceive it as an anti-discrimination law rather than an endorsement of religion or a particular religious practice."  Id.

Finally, in Texas Monthly, 489 U.S. at 1, five justices in two separate opinions struck down a Texas statute exempting religious periodicals, and no other publications, from state sales tax.[6]  In the view of this combined majority of the court, the statute failed for lack of a secular objective. See id. at 14-15; 28.  In his concurring opinion joined by Justice O'Connor, Justice Blackmun observed that "[a] statutory preference for the dissemination of religious ideas offends our most basic understanding of what the Establishment Clause is all

---

[6] The statute exempted "`[p]eriodicals that are published or distributed by a religious faith and that consist wholly of writings promulgating the teaching of the faith and books that consist wholly of writings sacred to a religious faith.'" Texas Monthly, 489 U.S. at 5.

about and hence is constitutionally intolerable." <u>Id.</u> at 28.   Here, by contrast, the statute both has an express secular purpose and it embraces a variety of land uses likely to encounter similar local opposition.   As such, it does not suffer from the <u>Texas Monthly</u> constitutional flaws.

In our view, the favorable attitude toward religion reflected in the Dover Amendment does not constitute a fostering of, or favoritism toward, religion over non-religion, but represents a secular judgment that religious institutions, by their nature, are compatible with every other type of land use and thus will not detract from the quality of life in any neighborhood.

An impressive body of case law and scholarly texts and articles supports this conclusion. <u>See</u> <u>Walz</u>, 397 U.S. at 689 (Brennan, J., concurring) ("[G]overnment grants exemptions to religious organizations because they uniquely contribute to the pluralism of American society by their religious activities."); <u>Concerned Citizens of Carderock</u> v. <u>Hubbard</u>, 84 F. Supp.2d 668, 674-75 (D. Md. 2000) ("It is . . . reasonable to presume that `churches . . . and other places of worship' . . . belong [in the] category of uses [that are] wholly compatible with single family home life." (citing E.C. Yokley, <u>Zoning Law and Practice</u> § 35-14, at 35 (4th ed. 1980, Supp. 1999) ("`Since the advent of zoning, churches have been held proper in residence districts.'"))); Kenneth H. Young, <u>Anderson's American Law of Zoning</u> § 12.22 at 578 ( 4th

ed. 1996) ("[R]eligious uses contribute to the general welfare of the community, and can contribute most when located in residential districts . . . .");[7] Terry Rice, "Re-Evaluating the Balance Between Zoning Regulations and Religious and Educational Uses," 8 Pace L. Rev. 1, 3 (1988) (The "dominant status" of churches and schools "is based on a recognition that religious and educational institutions are, by their very nature, beneficial to the public welfare."); cf. Texas Monthly, 489 U.S. at 12 (property tax exemption for churches "possessed the legitimate secular purpose and effect of contributing to the community's moral and intellectual diversity").

It is of some note, as well, that proximity to their houses of worship is for some groups a significant component of their religious practice.  Orthodox Jews, for example, believe they are prohibited by the Torah, the Jewish Bible, from using automobiles on their Sabbath. They therefore must live within walking distance of a synagogue.  See,

---

[7] The authors of this treatise note that there are "sound reasons" for excluding churches from residential districts, including the traffic associated with large numbers of people attending services and meetings, see § 12.22 at 578.  They ultimately conclude, however, that "an ordinance which excludes [religious] uses from residential zones does not further the public health, safety, morals, or general welfare," id., observing:

> Religious uses serve people best when they are accessible to homes.  Religious buildings provide convenient meeting places for youth groups and civic associations.  This need can be filled best when the religious institution is convenient to the residents who attend.

Id.

e.g., LeBlanc-Sternberg v. Fletcher, 67 F.3d 412, 430 (2d Cir. 1995); "State RFFAs," 32 U.C. Davis L. Rev. at 779-80.  Although we do not suggest that the Free Exercise Clause mandates the Dover Amendment,[8] the fact that the law may serve to avoid a possible barrier to participation in communal worship highlights its effect as an accommodation, rather than a promotion, of religion.  See Wallace v. Jaffree, 472 U.S. at 83 (O'Connor, J., concurring) ("[I]n determining whether the statute conveys the message of endorsement of religion . . . courts should assume that the `objective observer' . . . is acquainted with the Free Exercise Clause and the values it promotes."); cf. Forest Hills Early Learning Ctr. v. Grace Baptist Church, 846 F.2d 260, 263 ( 4th Cir. 1988) (exempting religious child care centers from state licensing requirements should be perceived as "'an accommodation of the exercise of religion rather than as a government endorsement of religion'" (quoting Amos, 483 U.S. at 349 (O'Connor, J., concurring)).

In sum, the law does not take any of the paths forbidden by the Establishment Clause.  It does not endorse an individual religious faith, it does not provide a direct financial subsidy to any religious organization, it does not inject religious activity into a nonreligious

---

[8] "It is well established . . . that `[t]he limits of permissible state accommodation to religion are by no means co-extensive with the noninterference mandated by the Free Exercise Clause.  Amos, 483 U.S. at 334 (quoting Walz, 397 U.S. at 673).  Some courts, however, have held that it is unconstitutional to exclude churches from residential areas.  See 2 William W. Bassett, Religious Organizations and the Law § 10:15 (1997).

-21-

context, and it does not "place [the state's] prestige, coercive authority, or resources" behind religious faith in general, see Texas Monthly, 489 U.S. at 9, other than to acknowledge its presence and value -- as does the Constitution -- as "an element of our societal mosaic," Walz, 397 U.S. at 693 (Brennan, J., concurring).  The concerns underlying the Establishment Clause arise not when religion is allowed by government to exist or even flourish, but when government sets a religious agenda or becomes actively involved in religious activity. See Amos, 483 U.S. at 337.  By protecting religious uses of land among others that are favored by communities generally, but that may encounter particular neighborhood disfavor, the Dover Amendment does not itself advance religion but clears the way so that churches themselves may do so.  This is a permissible effect under Lemon.  See Amos, 483 U.S. at 337.  ("A law is not unconstitutional simply because it allows churches to advance religion, which is their very purpose. For a law to have forbidden `effects' under Lemon, it must be fair to say that the government itself has advanced religion through its own activities and influence." (emphasis in original)).

   B.  The Belmont By-law

   As originally enacted in 1925, section 3 of Belmont's zoning by-law stated:

         In a single residence district,

(a) No building or structure shall be erected, altered or used for any other purpose than the following, including customary incidental uses:
(1) Single-family detached dwelling;
(2) Clubhouse . . . ;
(3) Lodging or boarding house . . . ;
(4) Educational or religious use . . . .

The by-law was later amended to reflect the requirements of the Dover Amendment, and the Schedule of Use Regulations that now constitutes § 3.3 permits in all zoning districts "Religious or educational use exempted from prohibition by [the Dover Amendment]."

The Belmont by-law reflects the same benevolent attitude toward religious uses of land that is implicit in the Dover Amendment and, as discussed earlier, we think it a passive preference that is consistent with constitutional principles. Among the by-law's stated purposes are "to encourage water supply, drainage, sewerage, schools, parks, open space and other public requirements" and "to encourage the most appropriate use of land throughout the Town." See Belmont Zoning By-law § 1.2 (emphasis added). A legislative judgment that religious activities are suitable in all neighborhoods, whether made on the state or local level, does not by itself promote the practice of religion. It simply recognizes the widely valued role of religious entities within our communities by guaranteeing them a physical place.

Although the by-law lacks the state statute's explicit anti-discrimination purpose, we do not consider that additional rationale

necessary to validate a zoning scheme that gives wide range to religious uses of property among other uses that are similarly important to all communities. Moreover, because the current version of the by-law specifically incorporates the Dover Amendment, we think it fair to view it as implicitly incorporating its anti-discrimination purpose.

In short, the Belmont by-law, like the Dover Amendment, is sufficiently secular in purpose and effect to fall within constitutional boundaries; it recognizes the value of religion without impermissibly promoting its exercise.

## III. <u>Conclusion</u>

We therefore conclude that both the state statute and the town by-law pass constitutional scrutiny.  Accordingly, we affirm the district court's grant of summary judgment for appellees.

Dissent follows.

**TORRUELLA, <u>Chief Judge</u> (Dissenting).** I am largely in agreement with the majority as to the legal standards which--fuzzy as they may be--apply to this case. However, my application of those standards leads me to a different result than that reached by the majority, and I must respectfully dissent.

My first principal disagreement with the majority is that I do not understand the Dover Amendment to be an anti-discrimination statute. Had the Commonwealth of Massachusetts intended to prohibit discrimination against religion and religious land uses, it easily could have enacted a law saying "No municipality may discriminate against a proposed use of land on the basis of the religious nature of the use or the religious beliefs or affiliation of the user." Such a genuine anti-discrimination law would be plainly permissible under the Establishment Clause. However, Massachusetts has instead prohibited any zoning ordinance that "prohibits, regulates or restricts" religious uses. The effect of this broader language goes far beyond prohibiting religious intolerance, by exempting religious users from the ordinary zoning process and by granting them a "free pass" with regard to perhaps the most important issue in zoning regulation--location.[9] In my view, either the Dover Amendment responds to a purpose substantially

---

[9]While the Dover Amendment allows for "reasonable regulation" of certain aspects of physical structures, there can be no dispute that the statute requires that religious uses be permitted on each and every parcel of land in every zoning district in the Commonwealth.

broader than merely preventing religious intolerance, or the statute is substantially broader than its purpose. Either way, the statute should not receive a "free pass" of its own as if it were merely an anti-discrimination measure.

Second, the Dover Amendment does not embody the "benevolent neutrality" deigned by the Supreme Court to be the proper balance between the competing mandates of the Religion Clauses. A "neutral" statute, in any ordinary sense of that word, would permit (and require) religious uses and religious users to operate on an even playing field with other uses and users, without special hindrances and without special advantage. The Dover Amendment, in contrast, eschews neutrality to place religion in an exalted position, exempt from the ordinary land-use decision making process.

The majority justifies this special treatment by holding that, here, religion is just one beneficiary of a law that provides benefits to a variety of groups and that, even if the benefit were restricted just to religion, the Dover Amendment would be justified as an attempt to remove an obstacle to the free exercise of religion. Although I would agree with either justification in principle, neither is applicable here.

The majority is of course correct to recognize that religious entities may be the beneficiaries of laws that, for secular reasons, benefit a variety of groups. See Majority Op. at 11 (citing Walz v.

Tax Comm'n of City of New York, 397 U.S. 664 (1970), and Mueller v. Allen, 463 U.S. 388 (1983)).  The lesson that I draw from cases such as Walz and Mueller is that, when religion is logically a member of some cohesive group to which a benefit is granted for a secular purpose, the Constitution does not demand the strange result of denying an otherwise available benefit to a group solely because of the group's religious nature.  However, the uses protected by the various provisions of Chapter 40A, § 3, of the Massachusetts General Laws do not comprise any cohesive scheme comparable to that in Walz and Mueller.  It is hard to imagine what common secular purpose unites such apparently divergent interests as religious land users, HAM radio operators, and residents who choose to use solar power in their homes.  The only common scheme that the majority offers is that "these uses, though important to all communities, would be at risk of exclusion from certain zoning areas because of local prejudice unrelated to their compatibility with the essential nature of the existing community." Majority Op. at 11.  Even assuming arguendo that these uses are in fact "important to all communities" and that there is a real "risk of exclusion," I submit that neither the appellees nor the majority have shown that such exclusion would be "unrelated to compatibility with the essential nature of the existing community."  Other than outright discrimination, which I heartedly agree could be properly prohibited (by an appropriate anti-discrimination statute), the majority can only suggest vaguely

that religious uses might be excluded based on a "general aversion to change in the neighborhood." See Majority Op. at 12. More telling, however, are the motivations noted by the majority in another section of its opinion--increased traffic and noise, aesthetic considerations, and impact on commercial development. See id. at 14. These concerns, of course, are directly related to the compatibility of a particular use or user with the essential nature of the existing community. In fact, far from evidencing some kind of religious intolerance (none of which is alleged in this case, by the way), these are precisely the kinds of secular concerns which form the basis for all zoning regulation.

The Dover Amendment insulates religion, HAM radio operators, solar energy users, et cetera, from these typical zoning concerns for one simple reason, which the majority recognizes--the state considers these uses "beneficial." Although the state may generally be free to protect a use or activity solely on the basis that the state likes it, the Establishment Clause prohibits such bare favoritism where the beneficiary is religion.

Nor do I think that the Dover Amendment can be justified as a governmental action aimed at lifting burdens on the free exercise of religion. See Maj. Op. at 12-13 (relying on Corporation of the Presiding Bishop of the Church of Jesus Christ of Latter-Day Saints v. Amos, 483 U.S. 327 (1987)). The majority states broadly that religious

users face local sentiments "ranging from outright hostility to indifference to the needs of religious organizations." Maj. Op. at 14. Apart from religious intolerance, however, (which, again, I fully agree can and should be prohibited by a proper anti-discrimination measure), the majority points only to routine zoning considerations such as concern with traffic, noise, aesthetics, and commercial stimulus as presenting potential "burdens" on the free exercise of religion. It may be true that religious users face these common obstacles in the zoning context, but only to the extent that all land users face them. Frankly, I cannot see that requiring religious users to participate in the ordinary process by which local land-use decisions are made amounts to such a burden on the exercise of religion as to justify a blanket preference like the Dover Amendment. Cf. Amos, 483 U.S. at 336 (finding that uncertain threat of liability imposed a "significant burden" on religious groups). Nor can I agree that the Dover Amendment merely "allows religious groups to advance their own cause" rather than constituting state promotion of religion. Through the Dover Amendment, Massachusetts has enacted a bare preference for religious uses of land and has placed the entire weight of the Commonwealth behind that preference. "Benevolent neutrality" and appropriate accommodation of religion are laudable and constitutional objectives, but the Dover Amendment simply goes too far, in my opinion. See Amos, 483 U.S. at

334-35 ("At some point, accommodation may devolve into 'an unlawful fostering of religion . . . .'").

Furthermore, just as I differ with the majority somewhat in my reading of Walz, Mueller, and Amos, I also have difficulty accepting the majority's distinction of other Supreme Court precedents. Unlike the majority, I find the Supreme Court's decision in Estate of Thornton v. Caldor, 472 U.S. 703 (1985), quite persuasive here. In the fundamental zoning consideration of location, the Dover Amendment provides religious users with precisely the kind of "absolute and unqualified right" rejected in Thornton. Id. at 709. Just as in Thornton, the Dover Amendment makes "no exception for special circumstances, . . . no exception when honoring the dictates of [religious users] would cause . . . substantial economic burdens or when . . . compliance would require the imposition of significant burdens on other[s, and] . . . no consideration as to whether the [municipality] has made reasonable accommodation proposals." Id. at 709-10.

Likewise, I read the Supreme Court's fractured decision in Texas Monthly, Inc. v. Bullock, 489 U.S. 1 (1989), to support striking the Dover Amendment. As Justice Brennan stressed on behalf of three justices:

> [W]hen government directs a subsidy exclusively
> to religious organizations that is not required
> by the Free Exercise Clause and that either

> burdens nonbeneficiaries markedly or cannot
> reasonably be seen as removing a significant
> state-imposed deterrent to the free exercise of
> religion, . . . it "provides unjustifiable awards
> of assistance to religious organizations" and
> cannot but "convey a message of endorsement" to
> slighted members of the community.

Texas Monthly, 489 U.S. at 15. Justices Blackmun and O'Connor stated that "[a] statutory preference for the dissemination of religious ideas offends our most basic understanding of what the Establishment Clause is all about," id. at 28 (Blackmun, J., concurring), and I believe the same is true of a statutory preference for religious users in zoning matters.

In summary, I cannot agree with the majority's acceptance of the Dover Amendment as a tolerable accommodation of religion. I would hold that the statute fails both the purpose and effects prongs of the Lemon test, and I would declare the Dover Amendment unconstitutional.

I am slightly more troubled by the need to strike down the Belmont bylaw. Unlike the majority, I am not entirely persuaded that the Dover Amendment and the Belmont bylaw must stand or fall together. After all, what troubles me about the Dover Amendment is largely the fact that it removes religious users from the ordinary land-use decision making process and thus places them in a position of considerable advantage over nonreligious uses and users. The Belmont bylaw would not necessarily raise such concerns, because a local zoning bylaw merely represents the product of precisely that ordinary local

decision making process which, if done on a "level playing field," properly determines local land-use issues. However, because the Belmont bylaw is so closely tied to the Dover Amendment, I would find that it is incurably infected with the unconstitutionality of the state statute and must be stricken. I do not suggest, however, that the Establishment Clause would prohibit the Town of Belmont from enacting a bylaw permitting religious uses in any or all of its zoning districts, so long as such bylaw were enacted through the ordinary land-use decision making procedures.