Truax v. City of Portsmouth          CV-00-63-B     06/18/01

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE


<u>Nancy Truax and Karen Johnson</u>

   v.                                    Civil No. 00-63-B
                                          2001 DNH 116
<u>City of Portsmouth, et al.</u>


<u>MEMORANDUM AND ORDER</u>


Nancy Truax and Karen Johnson, former members of the Portsmouth, New Hampshire Police Department, have filed a complaint against the City of Portsmouth, Police Chief Bradley Russ, and three members of the Portsmouth Police Commission, Theodore Mahoney, William Mortimer, and William Devine.  Truax and Johnson claim that defendants intentionally discriminated against them because they are women, sexually harassed them, and retaliated against them when they complained of the discrimination and harassment.  They base their claims on Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §

2000e et seq., the Fourteenth Amendment's Equal Protection Clause, and the First Amendment. Defendants challenge the complaint in a motion for summary judgment.

In this Memorandum and Order, I determine that: (1) plaintiffs' Title VII claims are barred to the extent that they are based on conduct that occurred more than three hundred days before plaintiffs filed their administrative complaints with the Equal Employment Opportunity Commission ("EEOC") and the New Hampshire Commission for Human Rights ("NHCHR"); (2) plaintiffs' constitutional claims are barred to the extent that they are based on conduct that occurred more than three years before plaintiffs filed their complaint in this court; (3) defendants are entitled to summary judgment with respect to all of Johnson's claims; (4) defendants are entitled to summary judgment with respect to Truax's Title VII and First Amendment retaliation claims; and (5) a jury must resolve Truax's intentional discrimination and sexual harassment claims.[1]

_____

    [1] After defendants filed their summary judgment motion, Truax and Johnson filed a second amended complaint alleging new claims on behalf of Truax. These new claims assert that Truax was constructively discharged as a result of defendants' continuing pattern of unlawful discrimination and retaliation. I

-2-

## I.  BACKGROUND[2]

The Police Department (the "Department") for the City of Portsmouth, New Hampshire (the "City") hired Nancy Truax and Karen Johnson to be police officers in 1981 and 1985, respectively.  They were the Department's first female police officers.

Their first few years in the Department were difficult for many reasons.  During the 1980's, many of Truax's fellow police officers refused to speak to her at all, even when they were assigned to work with her.  At the same time, many officers made repeated, unwanted sexual advances towards both Truax and Johnson on the job; some officers even went to Johnson's apartment to proposition her.  Officers often made vulgar jokes and comments about women, referring to them as, among other expletives, "fucking cunts."  Others suggested that women wanted to be police officers only because it gave them an opportunity to sleep with men.  In addition, Johnson and Truax found pornographic magazines

do not determine the sufficiency of these claims because defendants do not challenge them in their motion.

[2] I describe the background facts in the light most favorable to Truax and Johnson, the nonmoving parties.

and pictures of naked women in police cruisers and in the police station, including in the Department's official files.

## A. Truax's Career

While both Johnson and Truax experienced hostility from their male colleagues, Truax slowly began to rise through the ranks. She was promoted to detective in 1986 and to sergeant in 1990. Shortly after her promotion to sergeant, Truax was selected, based upon the recommendation of then-Captain Russ, to serve as an instructor in the Department of the Treasury's Office of Juvenile Justice and Delinquency Prevention ("OJJDP") Training Program. As an instructor, Truax traveled around the country presenting training programs on, among other topics, interviewing abused children and investigating cases involving missing children. She viewed her selection as "a reward for a job well done" and received an extra stipend for accepting this assignment. Her career advancement was not without difficulty, however.

In the early 1990's, while they were in the same city as part of their OJJDP duties, Russ propositioned Truax. Although they had previously had a brief romantic affair, she declined to

rekindle their relationship. Shortly thereafter, the OJJDP stopped assigning Truax to present training programs.

In the summer of 1998, Truax applied for a newly-announced Captain's position. The City's Police Commission (the "Commission"), an elected body, makes all significant personnel decisions, although it generally accepts the Department's recommendations.

In the weeks leading up to Truax's interview with the Commission, Russ, then Deputy Chief of Police, and a leading candidate to become Chief, stopped by Truax's office almost every day. During these visits, after making sure that no one was looking, Russ kissed her on the neck. When Truax shoved him away, he replied that he just couldn't help himself.

Prior to Truax's interview, Mahoney, Chairman of the Commission, recused himself from the process.[3] Despite words of encouragement from some of the interviewers, and the fact that Truax was at least as senior as either of the other two

---

[3] In 1995, when Mahoney was a candidate for Commissioner, Truax filed a complaint against him because he allegedly said that, although the FBI had high standards when he was an agent, "that all ended when they hired broads." The Commission investigated the matter and subsequently censored Mahoney.

candidates, Sergeant William Irving received the promotion instead of Truax. Russ later told Truax that he had recommended Irving for the position.

Subsequently, Truax's union, the International Brotherhood of Police Officers ("IBOP"), initiated a grievance on her behalf, asserting that Truax had been passed over for promotion because of her sex. In response, the Department argued that Irving had been promoted because of his superior computer skills. The Department acknowledged, however, that it had not given the applicants prior notice that computer skills would play a role in the decision. In October 1999, while her grievance was still pending, Truax was promoted to fill another Captain's position.

On March 26, 1999, Truax dual-filed a charge of discrimination with the NHCHR and the EEOC, in which she asserted claims of sexual harassment and sex-based discrimination. Shortly thereafter, her counsel sent a letter to the Department asking that it take steps to ensure her safety. The Department nevertheless placed a copy of her initial complaint in a public area of the Department. Subsequently, many officers have avoided her and she was not invited to attend meetings of the command

staff.

Thereafter, at a time not specified in the record, Truax became the subject of an investigation. According to Truax, a member of the Kittery, Maine Police Department pursued a suspect over the state line into Portsmouth. Truax, concerned that the chase unnecessarily endangered lives, ordered the Kittery officer to stop. He did not stop, and the chase ended in a crash. Truax told the media that she had ordered the officer to stop.

The Kittery Police Department maintained that Truax had never told the officer to stop. After an investigation by the New Hampshire State Police, the Department issued a press release which stated that the Kittery police never received Truax's order because she had misused the communications equipment. It is unclear from the record whether any disciplinary action ensued.

Truax resigned from the Department, effective January 1, 2001.

B. **Johnson's Career**

Johnson first filed a charge of discrimination against the Department with the NHCHR in 1991. In her charge, Johnson alleged that she had been treated differently because of her sex

and that she had been subjected to "a continuing pattern of sexual harassment." The Department investigated her allegations but took no action. Johnson decided not to actively pursue her charge of discrimination and the NHCHR dismissed it.

In June, 1999, Johnson told Captain Irving that she was concerned about some remarks that Russ Russo, a junior officer, had made to her during the course of an arrest. Captain Irving asked Johnson to speak with Russo directly to try and resolve the matter.

Johnson met with Russo in the presence of a few other officers in the Market Square section of Portsmouth on June 18, 1999. When Johnson asked Russo about his prior remarks, he allegedly replied "I don't have to listen to this shit" and started to move away from her. As Johnson moved towards him, Detective Michael Schwartz pinned Johnson's hands behind her and prevented her from following Russo. Johnson, upset, cursed her fellow officers loudly and in front of a number of citizens who were watching this incident. Johnson left and reported the incident to her superiors immediately.

The Department commenced an inquiry into Johnson's conduct

and placed her on administrative leave while the investigation was underway. Ultimately, the Department concluded that Johnson should be discharged because her conduct during the Market Square incident violated Department regulations and "would have resulted in a summons or arrest for disorderly conduct if it had been committed by a member of the public." Moreover, the Department found her actions to be "indicative of a negative pattern of behavior" which had previously resulted in prior administrative sanctions against Johnson.[4] After a public hearing, the Commission voted to discharge her, effective September 23, 1999.

The IBOP later initiated a grievance on Johnson's behalf, asserting that she had been discharged in violation of the "just cause" provision of the collective bargaining agreement entered into between the IBOP and the City. On August 18, 2000, an arbitrator concluded that the Commission had violated the "just cause" provision when it discharged Johnson. Accordingly, he

---

[4] The record shows that during the course of Johnson's career, she was the subject of over twenty citizen complaints and/or disciplinary investigations. Although Johnson was cleared of wrongdoing in some of these matters, she also received a number of warnings and letters of reprimand about her behavior, and was suspended from duty on multiple occasions.

ordered the Commission to reinstate Johnson immediately.  The

Commission has appealed this decision in state court and has not

reinstated Johnson.

## C.   Litigation

Truax and Johnson dual-filed charges of discrimination with

the NHCHR and the EEOC on March 26, 1999 and June 30, 1999,

respectively.  They commenced this action on February 10, 2000.


## II.   STANDARD OF REVIEW

Summary judgment is appropriate if the record, viewed in the

light most favorable to the non-moving party, shows that no

genuine issues of material fact exist and that the moving party

is entitled to judgment as a matter of law.  See Fed. R. Civ. P.

56(c); Ayala-Gerena v. Bristol Myers-Squibb Co., 95 F.3d 86, 94-

95 (1st Cir. 1996).  A material fact is one "that might affect

the outcome of the suit under the governing law."  Anderson v.

Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A genuine factual

issue exists if "the evidence is such that a reasonable jury

could return a verdict for the nonmoving party."  Id.

The party moving for summary judgment "bears the initial

responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] . . . which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the moving party has properly supported its motion, the burden shifts to the nonmoving party to "produce evidence on which a reasonable finder of fact, under the appropriate proof burden, could base a verdict for it; if that party cannot produce such evidence, the motion must be granted." Ayala-Gerena, 95 F.3d at 94 (citing Celotex, 477 U.S. at 323; Anderson, 477 U.S. at 249).

While courts must exercise restraint in granting summary judgment in cases where the nonmoving party must prove "elusive concepts such as motive or intent . . . summary judgement may be appropriate if the nonmoving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation." Smith v. Stratus Computer, Inc., 40 F.3d 11, 13 (1st Cir. 1994) (internal quotation marks and citations omitted); see DeNovellis v. Shalala, 124 F.3d 298, 306 (1st Cir. 1997).

I apply this standard in ruling on defendants' motion for

summary judgment.

## III.  DISCUSSION[5]

### A.  The Title VII Claims

Truax and Johnson allege that the City violated Title VII by:  (1) initially refusing to promote Truax to Captain because she is a woman; (2) discharging Johnson because she is a woman; (3) sexually harassing both Truax and Johnson; and (4) retaliating against both women because they complained about the sexual discrimination and harassment.[6]  The City challenges

_____

[5]  Truax and Johnson filed their objection to defendants' motion for summary judgment on February 5, 2001.  Their objection contained a request to supplement the record in accordance with Federal Rule of Civil Procedure 56(f).  They filed their supplemental materials on May 16, 2001, after the close of discovery.  See Pls.' Supplement to Summ. J. Objection, (Doc. No. 32).  After reviewing these supplemental materials, I conclude that they do not alter my analysis of defendants' motion for summary judgment.  Accordingly, I need not rule on Truax and Johnson's Rule 56(f) request.

[6]  Plaintiffs also attempt to base Title VII and equal protection claims on a disparate impact theory of sex discrimination.  Disparate impact claims are based on "employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity." Hazen Paper Co. v. Biggins, 507 U.S. 604, 609 (1993) (internal citation and quotation marks omitted).  Unlike disparate

-12-

plaintiffs' Title VII claims by first arguing that Title VII's 300-day statute of limitations bars most of the claims. They then challenge the sufficiency of those claims that are not barred by the statute of limitations. I address each argument in turn.

## 1. The Timely Filing Requirement

Defendants contend that Truax and Johnson are barred from recovering for any acts of discrimination that accrued more than 300 days before they filed their respective administrative charges of discrimination.[7] For the reasons discussed below, I

---

treatment claims, disparate impact claims do not require proof of discriminatory intent. See id. Neither plaintiff has a triable dispute impact claim under either Title VII or the Fourteenth Amendment because they base their claims on distinct instances of disparate treatment rather than on facially neutral practices that adversely impact women. See EEOC v. Steamship Clerks Union Local 1066, 48 F.3d 594, 601-02 (1st Cir. 1995). Plaintiffs' Fourteenth Amendment disparate impact claims also fail because the Equal Protection Clause does not reach such claims. See Bd. of Trustees of Univ. of Alabama v. Garrett, 121 S. Ct. 955, 967 (2001).

[7] The First Circuit has adopted a "notice standard" for determining when an employment discrimination claim accrues for limitations purposes. See Thomas v. Eastman Kodak Co., 183 F.3d 38, 50 (1st Cir. 1999), cert. denied, 120 S.Ct. 1174 (2000). This standard is satisfied, and the statute of limitations is triggered, only when "some tangible effects of the discrimination [become] apparent to the plaintiff," i.e., at the point when the

agree.

Title VII requires an aggrieved person to exhaust his or her administrative remedies as a prerequisite to filing suit in federal court. See Lawton v. State Mut. Life Assurance Co. of Am., 101 F.3d 218, 221 (1st Cir. 1996); Jensen v. Frank, 912 F.2d 517, 520 (1st Cir. 1990). To comply with this requirement, an individual must file a charge with the EEOC "within one hundred and eighty days after the alleged unlawful employment practice occurred." 42 U.S.C. § 2000e-5(e)(1) (2000). In a "deferral" state such as New Hampshire, this filing period is extended to three hundred days.[8] See id.; 29 C.F.R. § 1601.74 (2000)

_____

plaintiff becomes "aware that he will in fact be injured by the challenged practice." Id. (internal quotation marks and citation omitted).

[8] In certain circumstances, the filing requirements for complainants in deferral states may be more complicated. Title VII provides that a person in a deferral state must file a charge with the appropriate state agency within 240 days of the alleged discriminatory act and with the EEOC within 300 days of that act. See Sabree v. United Bhd. of Carpenters and Joiners, 921 F.2d 396, 399 (1st Cir. 1990). However, some state civil rights agencies have entered into "worksharing agreements" with the EEOC under which the two agencies are agents of one another for purposes of receiving charges and the state agency waives its sixty-day exclusive jurisdiction over such charges. See, e.g., Madison v. St. Joseph Hosp., 949 F. Supp. 953, 958 (D.N.H. 1996) (interpreting the 1994 EEOC-NHCHR worksharing agreement).

(listing the NHCHR as a designated agency).

The requirement that Title VII plaintiffs make a timely administrative filing to preserve their right to sue in federal court reflects a balance, struck by Congress, between the interests of employees and those of employers. See Thomas, 183 F.3d at 47. On the one hand, the filing period "guarantee[s] the protection of the civil rights laws to those who promptly assert their rights." Delaware State College v. Ricks, 449 U.S. 250, 256 (1980). On the other hand, it "also protect[s] employers from the burden of defending claims arising from employment decisions that are long past." Id. at 256-57.

The filing period operates as a statute of limitations, not as a rule of evidence. See DeNovellis, 124 F.3d at 309 n.5. Unless an exception applies, a discriminatory act that occurred outside of the limitations period cannot create liability. See United Air Lines, Inc. v. Evans, 431 U.S. 553, 555 n.4, 558 (1977); DeNovellis, 124 F.3d at 309 n.5. Evidence of time-barred

Because Truax and Johnson dual-filed their charges with the NHCHR and the EEOC, I need not address these complexities, and may calculate the proper limitations period simply by counting back 300 days from March 26, 1999 and June 30, 1999, the dual filing dates for Truax and Johnson, respectively.

acts of discrimination may, however, be admitted against a defendant to prove timely claims. See Evans, 431 U.S. at 558; DeNovellis, 124 F.3d at 309 n.5.

Title VII's requirement that complainants file a timely charge with the EEOC and/or the appropriate state agency does not create a jurisdictional bar to filing a suit in federal court. See Zipes v. Trans World Airlines, Inc., 455 U.S. 385, 393, 398 (1982); Bonilla v. Muebles J.J. Alvarez, Inc., 194 F.3d 275, 278 (1st Cir. 1999). Consequently, the period for filing an administrative charge, like a statute of limitations, is subject to equitable modification when necessary to protect fundamental fairness. See Zipes, 455 U.S. at 393, 398; Bonilla, 194 F.3d at 278; Morris v. Gov't Dev. Bank of Puerto Rico, 27 F.3d 746, 750 (1st Cir. 1994).

The 300-day limitations period extends back to May 30, 1998 for Truax and to September 3, 1998 for Johnson. Their Second Amended Complaint, however, details many incidents which took place well before this time. Indeed, many of their allegations of sexual harassment and disparate treatment concern events that occurred during the 1980's. Accordingly, Truax and Johnson

invoke the continuing violation doctrine in an attempt to impose liability on the City for these otherwise time-barred actions.

          a.    **Continuing Violation Doctrine**

The continuing violation doctrine is an equitable exception to the 300-day limitation period that allows an employee to "reach back" and obtain remedies for "otherwise time-barred allegations if they are deemed part of an ongoing series of discriminatory acts." O'Rourke v. City of Providence, 235 F.3d 713, 730 (1st Cir. 2001); see Provencher v. CVS Pharmacy, Div. of Melville Corp., 145 F.3d 5, 14 (1st Cir. 1998); Sabree, 921 F.2d at 400-01. In other words, "[i]f a Title VII violation is of a continuing nature, the charge of discrimination filed with the appropriate agency may be timely as to all discriminatory acts encompassed by the violation so long as the charge is filed during the life of the violation or within the statutory period (e.g., 300 days) which commences upon the violation's termination." Kassaye v. Bryant College, 999 F.2d 603, 606 (1st Cir. 1993). This doctrine "ensures that these plaintiffs' claims are not foreclosed merely because the plaintiffs needed to see a pattern of repeated acts before they realized that the individual

acts were discriminatory." Thomas, 183 F.3d at 54.

The First Circuit recognizes two varieties of continuing violations: serial violations and systemic violations. See, e.g., Megwinoff v. Banco Bilbao Vizcaya, 233 F.3d 73, 74-76 (1st Cir. 2000); Provencher, 145 F.3d at 14. Truax and Johnson contend they have set forth sufficient facts to establish a serial violation.

### i.  Serial Violation

A serial violation consists of "a number of discriminatory acts emanating from the same discriminatory animus, [with] each act constituting a separate wrong actionable under Title VII." Thomas, 183 F.3d at 53 (quoting DeNovellis, 124 F.3d at 307); see also Lawton, 101 F.3d at 221; Kassaye, 999 F.2d at 606.

To sustain a serial violation claim, a plaintiff must prove that at least one act in the series occurred within the limitations period. See DeNovellis, 124 F.3d at 307; Lawton, 101 F.3d at 221-22; Sabree, 921 F.2d at 400. The timely violation, sometimes referred to as the "anchor violation," must itself be an actionable wrong under Title VII. See Provencher, 145 F.3d at 14. A plaintiff cannot establish a serial violation merely by

-18-

showing that the effects of untimely acts of discrimination continued into the limitations period.  See DeNovellis, 124 F.3d at 309 (citing Evans, 431 U.S. at 558); Kassaye, 999 F.2d at 606.

The First Circuit has identified three criteria that should be considered when determining the sufficiency of a serial violation claim.  See O'Rourke, 235 F.3d at 731 (acknowledging that these criteria are modeled after the test set forth in Berry v. Bd. of Supervisors of L.S.U., 715 F.2d 971, 981 (5th Cir. 1983)).  These criteria are: (1) subject matter, i.e., "[I]s the subject matter of the discriminatory acts sufficiently similar that there is a substantial relationship between the otherwise untimely acts and the timely acts?" (2) frequency, i.e., "[A]re the acts isolated and discrete or do they occur with frequency or repetitively or continuously?" (3) permanence, i.e., "[A]re the acts of sufficient permanence that they should trigger an awareness of the need to assert one's rights?"  Id. (citations omitted); see Provencher, 145 F.3d at 14-15; Smith v. Bath Iron Works Corp., 943 F.2d 164, 166 (1st Cir. 1991).

The First Circuit has indicated that it considers permanence to be the most important of these factors.  See Sabree, 921 F.2d

at 402.  Permanence involves "an inquiry into what the plaintiff knew or should have known at the time of the discriminatory act." Id.  A plaintiff who knew or should have known that she was the victim of discrimination while the earlier, untimely acts were occurring cannot take advantage of the serial violation doctrine, because "[a] knowing plaintiff has an obligation to file promptly or lose [her] claim."  Id.; see also Provencher, 145 F.3d at 14; Bath Iron Works, 943 F.2d at 166.  In contrast, a serial violation claim may be asserted by "a plaintiff who is unable to appreciate that he is being discriminated against until he has lived through a series of acts and is thereby able to perceive the overall discriminatory pattern."  Provencher, 145 F.3d at 15 (quoting Sabree, 921 F.2d at 402).  "What matters is whether, when, and to what extent the plaintiff was on inquiry notice." Jensen, 912 F.2d at 522.  This so-called "revelatory standard" reflects the purpose of the continuing violation doctrine, which "is to permit the inclusion of acts whose character as discriminatory acts was not apparent at the time they occurred." Provencher, 145 F.3d at 15 (quoting Speer v. Rand McNally & Co., 123 F.3d 658, 663 (7th Cir. 1997)) (internal quotation marks

omitted).

The question of permanence is often a difficult one in cases such as this, where plaintiffs raise allegations of hostile work environment sexual harassment, because such harassment "is often a cumulative process . . . [that,] [i]n its early stages may not be diagnosable as sex discrimination or may not cross the threshold that separates the non-actionable from the actionable, or may not cause sufficient distress to be worth making a federal case out of." O'Rourke, 235 F.3d at 727, 732 (quoting Galloway v. General Motors Serv. Parts Operations, 78 F.3d 1164, 1166 (7th Cir. 1996)). Thus, although "not every hostile work environment claim presents a plausible continuing violation," courts should proceed with care when evaluating whether a plaintiff knew or should have known that she was subject to sexual harassment. Id. at 727-28, 732.

In this case, however, neither Truax nor Johnson can satisfy the revelatory standard because they both knew that they were the victims of sexual harassment and sex discrimination as early as 1991, and elected not to pursue their claims either administratively or in court. See Robbins v. Jefferson County

Sch. Dist. R-1, 186 F.3d 1253, 1258 (10th Cir. 1999) (finding that the plaintiff failed to satisfy the permanence requirement where she filed and withdrew a prior complaint with the EEOC). Thus, even assuming, for purposes of analysis, that plaintiffs can establish the other elements of a serial violation, their claim fails.

In 1991, Johnson filed a charge of discrimination with the NHCHR in which she stated: "I believe I have been subjected to a continuing pattern of sex discrimination and sexual harassment based upon my sex (female) since July 1985."[9] Charge of Discrimination, Exh. B to Defs.' Mot.; see also Aff. of Karen Johnson ("Johnson Aff."), Exh. 5 to Pls.' Objection to Defs.' Mot. for Summ. J. ("Pls.' Objection"), (Doc. No. 27), at ¶¶ 1, 13. By this time, the sexual harassment had caused Johnson such psychological harm that she felt compelled to seek counseling. See, e.g., Johnson Aff. at ¶¶ 21-22 ("The psychologist confirmed

---

[9] Johnson let this charge lapse, not because she had second thoughts about whether she had been subjected to sexual harassment and disparate treatment, but because "it didn't appear that there was anything that the [NHCHR] could do except to tell the police department to stop doing what it was doing." Dep. of Karen Johnson ("Johnson Dep."), Exh. A to Defs.' Mot. for Summ. J. ("Defs.' Mot."), (Doc. No. 14), at 22.

for me that my stress and nightmares were the direct result of the harassment I'd been experiencing on the job."). Thus, the record clearly shows that Johnson knew that she was being discriminated against both because she was a women and because she often voiced her complaints of sex-based discrimination to others. See, e.g., id. at ¶¶ 1, 12, 13 ("When I decided in 1989 that I had suffered enough at the hands of Orfe, I went to Don Clark who told me if I thought I had been sexually harassed I would be investigated. That threat effectively communicated to me that the Department would not help defend me from any harassing or discriminating conduct from other police officers."); Johnson Dep. at 39-40, 43-44, 52, 79-80.

In 1991, but prior to Johnson's filing of a charge with the NHCHR, the Department conducted an internal investigation of Johnson's allegations of sexual harassment and sex-based disparate treatment. As part of this investigation, the Department interviewed Truax about her experiences in the Department. She told investigators that she had been subjected to some forms of sexual harassment, but that she did not think it was a major problem within the Department. See Dep. of Nancy

-23-

Truax ("Truax Dep."), Exh. D to Defs.' Mot., at Vol. II, 61-62, and attached Questionnaire on Sexual Harassment in the Work Place and Incident Report.

In her deposition, however, Truax made it clear that her responses during that interview were less than complete. Truax Dep., Vol. II, at 59. Early in the investigation, Truax, who was also assigned to interview Johnson, became convinced that the Department wanted to find a pretext to terminate Johnson because they were unhappy with her complaints of discrimination. Id. at Vol. II, 56-59 ("[W]e were told that if we could pin her down in a lie we could fire her, and that was basically what we were sent in to do."). Accordingly, Truax felt that she "need[ed] to be very careful of what" she said in her own interview, because she "wanted to keep [her] job." Id. at Vol. II, 59. Therefore, Truax did not tell the interviewing officer all of the problems of sex-based harassment and discrimination that she felt existed within the Department at that time. Id. at Vol. II, 59.

Indeed, the record is replete with evidence that Truax, as early as 1990, knew that she had been subjected to sexual harassment and sex-based disparate treatment. See, e.g., Aff. of

Nancy Truax ("Truax Aff."), Exh. A to Pls.' Mot., at ¶¶ 7 ("It was apparent from the start that the Portsmouth Police Department was openly hostile to women."), 16, 71, 76; Truax Dep., at Vol. I, 75-76, 78, 89 ("I was ridiculed for being a woman, and I was straight out told directly that I wasn't wanted there and I wasn't going to make it."), 90-92. Moreover, since she interviewed Johnson she knew that these problems were not unique to her.

Unlike Johnson, however, Truax was reluctant to file internal complaints or charges with the NHCHR. See, e.g., Truax Dep., at Vol. I, 75. Because she was "determined to excel so [that she] could prove to everyone that [she] would become an excellent police officer," Truax made "every effort to ignore [the] many sexist, degrading comments and acts" of her co-workers throughout her career. Truax Aff. at ¶¶ 55, 146; see Truax Dep., at Vol. I, 75 ("It was my job to adapt to their environment."); see also Pls.' Memo. in Support of Objection to Defs.' Mot. for Summ. J., (Doc. No. 27), at 15 ("[B]oth women attempted to work through and improve a hostile working environment.").

This evidence establishes that Truax and Johnson knew, or at

the very least should have known, prior to the limitations period that they had colorable Title VII claims. Because they were, or should have been, aware that they were "being unlawfully discriminated against while the earlier acts, now untimely, were taking place," their serial violation claim must fail. Provencher, 145 F.3d at 14; see also Bath Iron Works, 943 F.2d at 166; Sabree, 921 F.2d at 402. Accordingly, any of their Title VII claims that flow from alleged acts of discrimination that accrued prior to May 30, 1998, for Truax, and September 3, 1998, for Johnson, are time barred. Therefore, I grant defendants' motion for summary judgment with regard to: (1) Truax's claim of quid pro quo sexual harassment, which concerns events which took place well before May 30, 1998; (2) Truax's hostile work environment sexual harassment claim, to the extent that it is based on events which occurred prior to May 30, 1998; and (3) Johnson's hostile work environment sexual harassment claim, to the extent that it is based on events which occurred prior to September 3, 1998.

## 2. Sex Discrimination

Truax and Johnson allege that the City discriminated against

them by:  (1) initially refusing to promote Truax to Captain because she is a woman; and (2) discharging Johnson because she is a woman.  See 42 U.S.C. § 2000e-2(a)(1) (making it unlawful to "discharge any individual, or otherwise to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex").  The City asserts that it took these actions for legitimate, non-discriminatory reasons and that Truax and Johnson offer insufficient evidence to support their assertions that these actions were motivated by unlawful bias.

I analyze Truax and Johnson's claims by applying the burden-shifting framework established by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  See Dominguez-Cruz v. Suttle Caribe, Inc., 202 F.3d 424, 429-30 (1st Cir. 2000); Smith v. F.W. Morse & Co., Inc., 76 F.3d 413, 421-22 (1st Cir. 1996).[10]

_____

[10]  The McDonnell Douglas burden-shifting framework is used in cases where the plaintiff seeks to prove discriminatory motivation entirely through circumstantial evidence.  See Dominguez-Cruz, 202 F.3d at 429.  A somewhat different inquiry ordinarily is warranted if the plaintiff bases her claim in part on direct evidence of discriminatory motivation.  See id. Although Truax has produced direct evidence to support her claim

-27-

## a. Truax's Claim

Under the first step of the burden-shifting framework, Truax must establish a prima facie case of discrimination by proving by a preponderance of the evidence that: (1) she is a member of a protected class; (2) she applied for, and was denied, a promotion for which she was qualified; and (3) after the denial, the City filled the position with someone with comparable qualifications.[11] See Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 142 (2000); McDonnell Douglas, 411 U.S. at 802; Petitti v. New England Tel. & Tel. Co., 909 F.2d 28, 32 (1st Cir. 1990). Truax's burden at this preliminary step is "not onerous." Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981); see Fernandes v. Costa Bros. Masonry, Inc., 199 F.3d 572, 584 n.4 (1st Cir. 1999) (describing the nature of proof

---

that the City intentionally discriminated against her, I follow the parties' lead in analyzing both plaintiffs' claims using the McDonnell Douglas rubric. See Smith, 76 F.3d at 421-22.

[11] The precise requirements of a plaintiff's prima facie case will differ depending on the type of discrimination alleged and the specific employment practice at issue. See McDonnell Douglas, 411 U.S. at 802 n.13. I have tailored my description of the prima facie case to fit the contours of Truax and Johnson's claims.

required to establish a prima facie case as "de minimis"). If Truax succeeds in making her prima facie case, she creates a rebuttable presumption that the City acted in a discriminatory manner. See St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506 (1993); Burdine, 450 U.S. at 254.

Construing the facts in the light most favorable to Truax, I conclude that she has established a prima facie case of discrimination. She is a woman and, therefore, a member of a class protected by Title VII. There is evidence in the record from which a reasonable jury could conclude that the City failed to promote her, that she was qualified for the position of Captain, and that this position was given to a man with comparable qualifications. See, e.g., Dep. of Bradley Russ ("Russ Dep."), Exh. 10 to Pls.' Objection, at 36; Aff. of Bradley Russ ("Russ Aff."), Exh. F. to Defs.' Mot., at attached Memo. from Brad Russ to Dianna Fogarty of 8/24/1998 (including attached resumes); Truax Aff. at ¶¶ 126, 131-32, 134-35. Given that Truax's burden is minimal at this initial stage, I find that she has established a prima facie case.

Once the plaintiff has set forth a prima facie case, the

-29-

burden shifts to the defendant, who can rebut the presumption of discrimination by articulating a legitimate, nondiscriminatory reason for its actions. See Hicks, 509 U.S. at 506-07; Burdine, 450 U.S. at 253-54. The defendant's burden is solely a matter of production; the burden of persuasion remains at all times with the plaintiff. See Hicks, 509 U.S. at 508; Burdine, 450 U.S. at 257-58, 260.

The City has articulated a nondiscriminatory reason for not promoting Truax and has produced admissible evidence in support of its position. The City asserts that it chose Irving over Truax, although they were both qualified for the position, and even though Truax had more seniority, "because he was believed to have exceptional knowledge and expertise with computers and the Department was looking for an individual with superior knowledge of computers." Aff. of William Mortimer ("Mortimer Aff."), Exh. G. to Defs.' Mot., at ¶ 6; Aff. of William Devine ("Devine Aff."), Exh. I. to Defs.' Mot., at ¶ 5; see also, e.g., Russ Aff. at ¶¶ 10-11, and attached Memo. from Russ to Dianna Fogarty of 8/24/1998.

Because both Truax and the City have met their burdens at

steps one and two of the <u>McDonnell Douglas</u> framework, the presumption of discrimination drops away, and I turn to the ultimate issue: whether Truax has presented sufficient evidence to prove that the City intentionally refused to promote her because of her sex. <u>See</u> <u>Reeves</u>, 530 U.S. at 153 ("The ultimate question in every employment discrimination case involving a claim of disparate treatment is whether the plaintiff was the victim of intentional discrimination."); <u>Burdine</u>, 450 U.S. at 253, 255-56; <u>Keeler v. Putnam Fiduciary Trust Co.</u>, 238 F.3d 5, 9 (1st Cir. 2001) (noting that, once the presumption disappears, "the plaintiff retains the ordinary burden of proving discrimination"). There is "no mechanical formula" for determining whether a plaintiff's evidence is sufficient to prove discrimination. <u>Feliciano De La Cruz v. El Conquistador Resort & Country Club</u>, 218 F.3d 1, 6 (1st Cir. 2000).

A "plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit [, but does not compel,] the trier of fact to

conclude that the employer unlawfully discriminated."[12] <u>Reeves</u>, 530 U.S. at 148. Whether such a showing is sufficient to prove discrimination will depend upon the circumstances of the case, including "the strength of the plaintiff's prima facie case, and the probative value of the proof that the employer's explanation is false." <u>Id.</u> Of course, a plaintiff may choose to offer additional evidence of discriminatory intent in order to buttress her claim and satisfy her burden of proof. <u>See</u> <u>Feliciano De La Cruz</u>, 218 F.3d at 10; <u>Dominguez-Cruz</u>, 202 F.3d at 430 n.5.

---

[12] In <u>Reeves</u>, the Supreme Court rejected the "pretext plus" standard, which required that the plaintiff produce evidence of pretext plus additional evidence of discriminatory intent, beyond that asserted as part of the plaintiff's prima facie case. <u>See</u> 530 U.S. at 147-49. The Court identified the First Circuit as one of the courts that had adopted the "pretext plus" standard. <u>See</u> <u>id.</u> at 140-41 (citing <u>Woods v. Friction Materials, Inc.</u>, 30 F.3d 255 (1st Cir. 1994)).

The First Circuit responded to <u>Reeves</u> by asserting that it had never adopted the "pretext plus" standard: "Although our prior use of the label "pretext plus," may have resulted in a misunderstanding about the proof required to state a discrimination claim in this circuit, we have been careful to explain that the phrase did not mean that the plaintiff must present evidence beyond the proof of pretext in order to establish discrimination." <u>Feliciano De La Cruz</u>, 218 F.3d at 10 (denying panel rehearing) (citations omitted). Thus, according to the First Circuit, its "precedents are in accordance with <u>Reeves</u>." <u>Id.</u>; <u>see also</u> <u>Fite v. Digital Equip. Corp.</u>, 232 F.3d 3, 7 (1st Cir. 2000) (discussing pre-<u>Reeves</u> case law).

Regardless of the type or quantum of proof offered by the plaintiff, a court, in evaluating a motion for summary judgment, should consider all relevant evidence of pretext and discrimination in the aggregate. See Dominguez-Cruz, 202 F.3d at 431; Fernandes, 199 F.3d at 581. In other words, the appropriate inquiry is whether, based on the totality of the evidence, a reasonable jury could infer that the defendant's proffered explanation was pretextual and that the defendant was actually motivated by discriminatory animus. See Feliciano De La Cruz, 218 F.3d at 6-7; Dominguez-Cruz, 202 F.3d at 431. The First Circuit has cautioned that courts making this inquiry into an employer's motivation should be especially reluctant to grant summary judgment in the employer's favor. See, e.g., Hodgens v. Gen'l Dynamics Corp., 144 F.3d 151, 167 (1st Cir. 1998); DeNovellis, 124 F.3d at 306; Mulero-Rodriguez v. Ponte, Inc., 98 F.3d 670, 677 (1st Cir. 1996). I now consider the evidence that Truax offers in support of her claim.

First, Truax alleges that she spoke with Russ the day after Irving was promoted and asked him whether, if she had been a man, Russ would have still recommended Irving for the position. Truax

Dep., at Vol I, 79.  In response, according to Truax, Russ said "I might have promoted you."[13] Id.  This statement is more than a mere stray remark.  See Dominguez-Cruz, 202 F.3d at 433 n.6; Fernandes, 199 F.3d at 583.  Given the importance of Russ' recommendation, and the temporal proximity of his remark to the promotion decision at issue, it constitutes significant direct evidence that Russ made his recommendation on the basis of sex.  See McMillan v. Mass. Soc'y for the Prevention of Cruelty to Animals, 140 F.3d 288, 300-01 (1st Cir. 1998).  Further, a reasonable jury could infer from this evidence that the City's explanation for its decision was a pretext for unlawful discrimination.  See id.; Dominguez-Cruz, 202 F.3d at 433 n.6; Fernandes, 199 F.3d at 583.  Russ denies making this statement. He also denies another allegation made by Truax, namely, that he came to her office and kissed her on the neck in the weeks prior

----

[13]  The record shows that the Commission generally defers to the promotion recommendations made by the Department's administration.  See, e.g., Mortimer Aff. at ¶¶ 4-5, Russ. Aff. at ¶ 6.  A reasonable jury could infer that, because Russ was a leading candidate to become the permanent Chief of Police, his recommendation carried substantial weight with other members of the Department's administration and with the Commission.  See Russ Dep. at 27-34.

to the interview.[14]  I need not determine whether Truax or Russ

is telling the truth, however, because "any such credibility

determinations are for the factfinder at trial, not for the court

at summary judgement."  Simas, 170 F.3d at 49; see Dominguez-

Cruz, 202 F.3d at 432; Woodman v. Haemonetics Corp., 51 F.3d

1087, 1091 (1st Cir. 1995).   Second, Truax alleges that Russ

told her that he "had no concrete reason for the decision" not to

promote her.  Truax Aff. at ¶ 135.  Moreover, Russ conceded in

his deposition that at no time prior to the interview process had

he or the Department indicated that the Department wanted the new

Captain to have significant computer skills.[15]  Russ Dep. at 67.

In addition, Truax asserts that, in the past, the Department

---

[14]  In addition, I note that Truax alleges:  (1) that Russ
used his influence to have her removed as an OJJDP instructor
after she refused to rekindle their affair; and (2) that, while
she and Russ were engaged in a dispute over office space in the
early 1990's, Russ said: "Well, Nancy, don't you think it would
behoove you to have me as your friend rather than your enemy for
future promotions."  Truax Dep., at Vol. I, 70.

[15]  The Department's "Policy for Promotions" lists five
"general items [that] will always be considered" during the
promotion process:  (1) the recommendation of the Chief of
Police; (2) seniority; (3) past job performance and acquired
skills; (4) educational background; and (5) a "proven willingness
to contribute unselfishly" to help the Department achieve its
goals.  Policy for Promotions, Exh. 14 to Pls.' Objection.

considered seniority to be a significant factor in promotion decisions.  See Policy for Promotions.  Thus, she argues that, because she was senior to Irving and because the City had not articulated any prior desire for a Captain with computer skills, the City's explanation for its decision not to hire her is not worthy of credence.  While the City does not dispute that Truax was senior to Irving[16], it contends that Irving's computer skills compensated for the relatively small difference in seniority between them.

Where, as here, an employer asserts that he relied on a previously unarticulated factor in reaching an employment decision, a factfinder may infer that the actual reason for the decision was discriminatory animus.  See Dominguez-Cruz, 202 F.3d at 432; Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 56 (1st Cir. 2000).  Moreover, Russ' differing explanations for the decision also constitute circumstantial evidence of discriminatory intent.  See Dominguez-Cruz, 202 F.3d at 432 (holding that when an employer, "at different times, gives

_____

[16]  At the time, Truax had served on the Portsmouth police force for more years than Irving.  They were both promoted to Sergeant on the same day in 1990.

different and arguably inconsistent explanations, a jury may infer that the articulated reasons are pretextual").

After reviewing all the evidence, and construing it in the light most favorable to Truax, I conclude that Truax has raised a genuine factual dispute concerning the actual motivation for the City's decision not to promote her. Accordingly, I deny the City's motion for summary judgment with regard to Truax's disparate treatment claim. I now address Johnson's disparate treatment claim.

b. **Johnson's Claim**

Under the first step of the burden-shifting framework, Johnson must establish a prima facie case of discrimination by proving by a preponderance of the evidence that: (1) she is a member of a protected class; (2) she performed her job satisfactorily; (3) she was discharged; and (4) after she was discharged, her employer continued to have her duties performed by a comparably qualified person. See Reeves, 530 U.S. at 142; McDonnell Douglas, 411 U.S. at 802; Santiago-Ramos, 217 F.3d at 54. If Johnson succeeds in carrying her comparatively light burden at this preliminary step, she creates a rebuttable presumption that the City acted in a discriminatory manner. See

Hicks, 509 U.S. at 506; Burdine, 450 U.S. at 253-54.

Johnson is a woman and, therefore, a member of a class protected by Title VII. There is evidence in the record from which a reasonable jury could conclude that the City discharged her and continued to have her duties performed by comparably qualified officers. Although Johnson's burden is minimal at this initial stage, I note that a substantial question exists as to whether she performed her job satisfactorily. See Oliver v. Digital Equip. Corp., 846 F.2d 103, 108 (1st Cir. 1988) (noting that the prima facie case and the question of employer motive are "irretrievably intertwined" where the employer asserts that it discharged the plaintiff because her job performance was not satisfactory). I assume for the moment, however, that she has satisfied this element of her prima facie case. See id.; Santiago-Ramos, 217 F.3d at 54.

The burden now shifts to the City, who can rebut the presumption of discrimination by articulating a legitimate, nondiscriminatory reason for its actions. See Hicks, 509 U.S. at 506-07; Burdine, 450 U.S. at 253-54. The City's burden is solely a matter of production; the burden of persuasion remains at all times with Johnson. See Hicks, 509 U.S. at 508; Burdine, 450

U.S. at 257-58, 260.

The City has articulated a nondiscriminatory reason for discharging Johnson and has produced admissible evidence in support of its position.  The City asserts that it discharged Johnson because of her conduct during the Market Square incident "and the inordinate number of disciplinary issues and citizen complaints during her employment as a police officer."  Mortimer Aff. at ¶ 10; see Mahoney Aff. at ¶¶ 10-11 and attached "Decision of the Portsmouth Police Commission Concerning Personnel Investigation IAD # 99-15 Officer Karen Johnson" (hereinafter the "Commission Decision"); Devine Aff. at ¶¶ 8-9.

I note that, although the City and Johnson offer differing accounts of the Market Square incident, Johnson admits that she confronted, and cursed at, fellow officers in public.  See Johnson Dep. at 116-120.  She testified during her deposition that she regrets her actions and acknowledges that it was not her "proudest moment."  Id. at 120-21.  Moreover, the record shows that during her tenure in the Department, Johnson had: (1) been the subject of multiple citizen complaints; (2) been suspended from duty on numerous occasions for disciplinary violations; and (3) received numerous warnings regarding her behavior.  See Memo.

from Michael Magnant to Bradley Russ of 7/9/1999, attached to Russ. Aff. (describing Johnson's disciplinary history); Commission Decision. In addition, some of Johnson's fellow officers have expressed their concern about her ability to be a police officer. See, e.g., Dep. of Anne Rogers-Bernier, Exh. C2 to Defs.' Mot., at 95-96 ("I would not trust her to back me up in a situation . . . One minute she's got things under her control and the next minute she's screaming at everybody."); Dep. of Leonard Disesa, Exh. C3 to Defs.' Mot., at 30-34.

Because both Johnson and the City have met their burdens at steps one and two of the McDonnell Douglas framework, the presumption of discrimination drops away and I turn to the ultimate issue: whether Johnson has presented sufficient evidence to prove that the City intentionally discharged her because of her sex. See Reeves, 530 U.S. at 153; Hicks, 509 U.S. at 507-08, 510-11; Burdine, 450 U.S. at 253, 255-56; Keeler, 238 F.3d at 9.

In evaluating Johnson's claim, I consider all relevant evidence of pretext and discrimination in the aggregate. See Fernandes, 199 F.3d at 581; Dominguez-Cruz, 202 F.3d at 431. In other words, I must determine whether, based on the totality of

the evidence, a reasonable jury could infer that the City's proffered explanation was pretextual and that the City was actually motivated by discriminatory animus. See Dominguez-Cruz, 202 F.3d at 431; De La Cruz, 218 F.3d at 6-7. In making this determination, I am mindful of the fact that the First Circuit has cautioned that courts making this inquiry into an employer's motivation should be especially reluctant to grant summary judgment in the employer's favor. See, e.g., Hodgens, 144 F.3d at 167; DeNovellis, 124 F.3d at 306. I now consider the evidence that Johnson offers in support of her claim.

First, Johnson contends that Commissioner Mahoney's 1995 statement that the FBI's high standards ended "when they hired broads" is proof of discriminatory animus. The probative value of this remark is minimal, however, because it was: (1) neither directed at Johnson nor related to the decision to discharge her; and (2) made years prior to her discharge. See Dominguez-Cruz, 202 F.3d at 433 n.6; McMillan, 140 F.3d at 301 (noting that the probative value of a decisionmaker's remarks "is circumscribed if they were made in a situation temporally remote from the date of the employment decision in question . . . or if they were not related to the employment decision in question").

Second, Johnson argues that the arbitrator's ruling on her grievance supports her claim in this case. Arbitrator Pinkus acknowledged that Johnson's behavior was cause for some disciplinary action, but he concluded that the City violated the collective bargaining agreement's "just cause" provision when it discharged Johnson because: (1) her discharge violated the notion of "progressive discipline" because it constituted too harsh a punishment for her offense; (2) the Department had indicated to Johnson that certain prior incidents of bad behavior would not be cause for future discipline; and (3) Johnson was not allowed to cross examine one of the witnesses against her, a teenager who had witnessed the Market Square incident and whose affidavit was read at the hearing. See Opinion and Award, dated Aug. 18, 2000, attached to Mahoney Aff.

An "arbitral decision may be admitted as evidence and accorded such weight as the court deems appropriate" based on "the facts and circumstances of each case." Alexander v. Gardner-Denver Co., 415 U.S. 36, 60, 60 n. 21 (1974). Among the relevant factors that a court should consider in determining the weight to be accorded to an arbitral opinion are: (1) "the existence of provisions in the collective bargaining agreement

that conform substantially with Title VII;" (2) the "degree of procedural fairness in the arbitral forum;" (3) the "adequacy of the record with respect to the issue of discrimination;" and (4) "the special competence of particular arbitrators." Id. at 60 n.21.

Applying the relevant factors, I conclude that Arbitrator Pinkus' Opinion and Award is not entitled to any weight on the issue of whether the City discharged Johnson due to her sex because: (1) the collective bargaining agreement's "just cause" provision does not "conform substantially" with the language of Title VII; and (2) Arbitrator Pinkus never addressed the issue of whether Johnson's discharge was tainted by discriminatory animus. See Gardner-Denver Co., 415 U.S. at 60 n. 21; Jackson v. Bunge Corp., 40 F.3d 239, 246 (7th Cir. 1994) (holding that it was not an abuse of discretion for a district court to exclude evidence of an arbitrator's decision at trial where "the arbitrator never addressed the issue" of whether the employer had a discriminatory motive).

Third, Johnson offers an affidavit from Penny Harrington, the former Chief of Police of Portland, Oregon, and a proposed expert witness. Because the City does not challenge the

-43-

admissibility of Harrington's testimony, I assume, for purposes of discussion only, that it is admissible as expert testimony.[17] See Cortes-Irizarry v. Corporacion Insular De Seguros, 111 F.3d 184, 188 (1st Cir. 1997) (suggesting that courts should be wary of ruling on the admissibility of expert testimony at the summary judgment stage); see also Fed. R. Evid. 702; Lipsett v. Univ. of Puerto Rico, 740 F. Supp. 921, 923-25 (D.P.R. 1990) (denying motion to qualify witnesses as experts in the field of sexual harassment).

Harrington, however, offers little more than conclusory assertions based on Johnson's own allegations. For example, she opines, without offering supporting evidence, that Johnson was "treated very differently from other officers, and was ultimately

---

[17] I note that Harrington's affidavit contains neither a copy of her curriculum vitae nor a list of the documents upon which she bases her opinion. See Aff. of Penny Harrington ("Harrington Aff."), Exh. 16 to Pls.' Objection, at ¶¶ 10, 13. Thus, even assuming that Harrington has some "specialized knowledge" that would assist the jury, these omissions make it impossible to ascertain whether her testimony would satisfy the requirements of the recently revised Rule 702. See Fed. R. Evid. 702 (stating that a witness, "qualified as an expert by knowledge, skill, experience, training, or education" may testify "if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case."); see also Fed. R. Evid. 703.

dismissed" because she chose to confront anti-female bias in the Department. Harrington Aff. at ¶ 16. Such testimony casts little, if any, new light on whether the City discharged Johnson because she is a woman.

Fourth, Johnson argues that she was discharged despite the fact that male officers, under similar circumstances, had received more lenient discipline. Evidence of this sort is certainly probative of discriminatory intent, provided that "a prudent person, looking objectively at the incidents, would think them roughly equivalent and the protagonists similarly situated." Carey v. Mt. Desert Island Hosp., 156 F.3d 31, 38 (1st Cir. 1998) (internal quotation marks and citations omitted). "Exact correlation is neither likely nor necessary, but the cases must be fair congeners." Id.; see Perkins v. Brigham & Women's Hosp., 78 F.3d 747, 751 (1st Cir. 1996). Johnson bears the burden of showing that the individuals with whom she seeks to be compared to "engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." Perkins, 78 F.3d at 751 (quoting Mitchell v. Toledo Hosp., 964 F.2d 577, 582 (6th Cir. 1992)); see Smith, 40 F.3d at 17.

Johnson compares her situation to that of a male officer who, in violation of Department rules, took one of the Department's submachine guns to a firing range and allowed a civilian to shoot it. Despite this violation, the officer's only punishment was removal from the Department's Emergency Response Team and a two-day suspension.

Johnson fails, however, to provide any information about the officer's prior disciplinary history. See Perkins, 78 F.3d at 751 (noting that the plaintiff, unlike the comparator, had a "history of repeated disciplinary actions over a ten-year period" and therefore the requisite similarities were lacking); Smith, 40 F.3d at 17. Thus, even assuming that these dramatically different factual circumstances could be construed as being roughly equivalent, Johnson fails to provide "a sufficient foundation for a legally relevant comparison" between herself and the male officer and, therefore, this comparison "cannot support an inference that [her] dismissal was motivated by discriminatory animus." Smith, 40 F.3d at 17; see Perkins, 78 F.3d at 751. Johnson's other possible comparators fail for the same reason.[18]

---

[18] For example, Johnson alleges that, in the past, the Department encouraged male officers to "take it out back," i.e.,

Lastly, Johnson claims that the Department's history of discrimination, and the relatively small number of women in the Department, supports an inference that her discharge was the product of intentional discrimination. While these facts are relevant, they are insufficient here, given the paucity of other evidence of pretext or discriminatory animus offered by Johnson, to create a question of material fact as to whether the City discharged Johnson because of her sex. See Santiago-Ramos, 217 F.3d at 55 (stating that evidence of a discriminatory atmosphere "may be considered along with any other evidence bearing on motive" in deciding whether a Title VII plaintiff has met her burden) (emphasis in the original) (internal quotation marks and citation omitted).

Even when viewed in the light most favorable to Johnson, the record in this case supports the City's contention that it discharged her because of her unfavorable disciplinary record, culminating in the Market Square incident. Johnson has failed to raise a genuine factual dispute as to whether the City's

---

to settle their disputes through physical confrontations, and that they were rarely disciplined even when such confrontations became violent. She fails, however, to provide any details about these incidents.

articulated reason for her discharge was a pretext for unlawful discrimination. Accordingly, I grant the City's motion for summary judgment with regard to this claim.

### 3. Sexual Harassment

Truax and Johnson next allege that the City violated Title VII by fostering and condoning the creation of a work environment that is so infused with hostility towards women that it creates an abusive work environment. See Meritor Savs. Bank v. Vinson, 477 U.S. 57, 66 (1986) (holding that "a plaintiff may prove a violation of Title VII by proving that discrimination based on sex has created a hostile or abusive work environment"); see also Harris v. Forklift Sys., Inc., 510 U.S. 17, 21-23 (1993); O'Rourke, 235 F.3d at 728. The City argues that it is entitled to summary judgment on these claims because: (1) Truax and Johnson have produced insufficient evidence upon which to base their hostile work environment claims; and (2) neither Truax nor Johnson suffered a "tangible employment action" and, therefore, the City may avail itself of the affirmative defense to vicarious liability and damages set forth by the Supreme Court in Burlington Industries, Inc. v. Ellerth, 524 U.S. 742 (1998). For the reasons discussed below, I grant the City's motion with

regard to Johnson's claim and deny it with regard to Truax's claim.

### a. The Governing Law

"For sexual harassment to be actionable, it must be sufficiently severe or pervasive to alter the conditions of [the victim's] employment and create an abusive working environment." Meritor Savs. Bank, 477 U.S. at 67 (internal quotation marks and citation omitted). The work environment "must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." Farragher v. City of Boca Raton, 524 U.S. 775, 787 (1998) (citing Harris, 510 U.S. at 21-22).

In evaluating whether the alleged sexual harassment is sufficiently severe to be actionable, a court must consider "the record as a whole" and the "totality of the circumstances." Meritor Savs. Bank, 477 U.S. at 69 (internal quotation marks and citations omitted); see Clark County Sch. Dist. v. Breeden, 121 S.Ct. 1508, 1510 (2001) (per curiam) ("Workplace conduct is not measured in isolation"); Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81-82 (1998) (Ginsburg, J., concurring) (noting that this "inquiry requires careful consideration of the

social context in which particular behavior occurs and is experienced by its target"). In making this determination, a court should consider "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Harris, 510 U.S. at 23 (noting that "no single factor is required"). A court must also consider harassing conduct, even though "not explicitly sexual in nature, which undermines [the plaintiff's] ability to succeed at her job." O'Rourke, 235 F.3d at 729; see Lipsett v. Univ. of Puerto Rico, 864 F.2d 881, 905 (1st Cir. 1988).

As discussed above, much of the most damning evidence of sexual harassment produced by Truax and Johnson falls outside of the limitations period, and therefore, cannot create liability. Accordingly, I limit my analysis to whether the events that allegedly occurred within the limitations period suffice to establish the existence of a hostile working environment.

Because Truax and Johnson: (1) dual-filed their charges with the NHCHR and the EEOC at different times, and therefore have different limitations periods; and (2) left the Department at

different times, I analyze their claims separately. <u>See, e.g.</u>, <u>Edwards v. Wallace Cmty. College</u>, 49 F.3d 1517, 1522 (11th Cir. 1995) (noting that events which were not made known to the plaintiff until after she was terminated could not have contributed to her subjective perception of her work environment).

### b. <u>Johnson's Claim</u>

Johnson alleges that the following events contributed to the creation of a hostile work environment in the Department during her tenure: (1) the Department's decision to require her to undergo a psychological evaluation in September of 1998 to determine her fitness for duty; (2) her discovery, in the police station, of a "muscle magazine" containing pictures of scantily clad women; (3) the City's discrimination against and harassment of Truax; and (4) certain harassing statements Sergeant Famulari made to other women.[19] The City argues, and I agree, that this

---

[19] The First Circuit has advised that "[c]ourts should avoid disaggregating a hostile work environment claim, dividing conduct into instances of sexually oriented conduct and instances of unequal treatment, then discounting the latter category of conduct." <u>O'Rourke</u>, 235 F.3d at 730. Accordingly, I consider the alleged harassing conduct in the aggregate. <u>See</u> <u>id.</u> at 729. Of course, I need not consider those events which occurred after the City discharged Johnson. <u>See</u> <u>Edwards</u>, 49 F.3d at 1522.

evidence, even when viewed in the aggregate and considered in the light most favorable to Johnson, does not satisfy her burden at summary judgment.

First, the City contends that it required Johnson to undergo a psychological evaluation because she had recently told people in the Department that she was being treated for depression and a number of citizens had recently filed complaints against her. Johnson, in response, fails to offer any evidence to suggest that the Department made this decision because of her sex. See O'Rourke, 235 F.3d at 728-29; Higgins v. New Balance Athletic Shoe, Inc., 194 F.3d 252, 258 (1st Cir. 1999) (holding that, where a plaintiff "toiled in a wretchedly hostile environment," but failed to show that he was harassed because of sex, the district court properly granted summary judgment for the defendant). As a result, she does not advance her argument merely by alleging that she was required to undergo a psychological evaluation.

Second, the circumstances under which Johnson was exposed to the "muscle magazine" will not support a sexual harassment claim. Johnson claims that another officer left the "muscle magazine" on his desk when he went to change his clothes. While Johnson

asserts that the magazine depicted scantily clad women, she does not claim that it qualifies as pornography or that its focus was predominately on women.  See Johnson Dep. at 56-57.  Nor does she assert that it was placed on display in the Department.

Third, Johnson cannot establish her sexual harassment claim merely by focusing on any sexual harassment and/or discrimination that Truax suffered.  In certain circumstances, a court should consider harassing conduct towards women other than the plaintiff when evaluating a sexual harassment claim.  See Hernandez-Loring v. Universidad Metropolitana, 233 F.3d 49, 55 n.4 (1st Cir. 2000); Lipsett, 864 F.2d at 905.  While the plaintiff need not be present for this conduct to contribute to her subjective impression that her work environment is hostile or abusive, she must at least be aware that this other harassment is occurring. See, e.g., Brooks v. City of San Mateo, 229 F.3d 917, 924 (9th Cir. 2000) ("Harassment directed towards others of which an employee is unaware, can, naturally, have no bearing on whether [the plaintiff] reasonably considered her working environment abusive."); Hirase-Doi v. U.S. West Comms., Inc., 61 F.3d 777, 782 (10th Cir. 1995) ("[Plaintiff] could not subjectively perceive [her fellow employee's behavior] towards others as

creating a hostile work environment unless she knew about that behavior."); Edwards, 49 F.3d at 1522; Morales-Evans v. Admin. Office of the Courts of the State of New Jersey, 102 F. Supp. 2d 577, 588-89 (D.N.J. 2000) (holding that statements made outside the plaintiff's presence are not probative as to the question of whether her work environment was hostile or abusive).

In this case, while Johnson was undoubtedly aware that Truax was not promoted, there is no indication in the record that she knew of Russ' encounters with Truax. Thus, the latter events could not have contributed to Johnson's subjective impression that the Department was a hostile work environment. See, e.g., Brooks, 229 F.3d at 924; Hirase-Doi, 61 F.3d at 782.

Lastly, Johnson attempts to buttress her claim by referring to statements allegedly made by Sargeant Famulari towards other female officers. See, e.g., Dep. of Anne K. Rogers-Bernier, Exh. 11 to Pls.' Objection, at 71 ("[w]hy don't you go home and make us muffins . . . [w]omen don't bust down doors like men don't wear lipstick."). It is unclear when these statements were made, although I note: (1) that they only came to light during a 1998 investigation of Famulari; and (2) there is evidence in the record which suggests that some of these statements were made a

year earlier, outside of the limitations period. I assume, however, for purposes of defendants' motion, that they were made during the limitations period and that Johnson had knowledge of them.

After reviewing the record as a whole, however, including the statements allegedly made by Sargeant Famulari, I conclude that Johnson fails to offer sufficient evidence to permit a reasonable jury to conclude that Johnson suffered sexual harassment that was so severe or pervasive that it altered the conditions of her employment and created an abusive work environment. Accordingly, I grant the City's motion for summary judgment with regard to this claim.

### c. Truax's Claim

The crux of Truax's claim is that Russ' repeated visits to her office created a hostile work environment. First of all, I note that, although Truax's complaint focuses on her allegation that Russ repeatedly kissed her on the neck in the weeks leading up to her interview for the Captain's position, in her deposition she stated that Russ kissed her on the neck "often over the years," and that his visits to her office increased in frequency in the months leading up to the interview. Truax Dep., at Vol.

II, 65.  In the two weeks leading up to the interview, Russ came into Truax's office and kissed her on the neck five or six times. Id. at 64.  When she pushed him away, he allegedly replied "I just can't resist" or "I just can't help myself."  Id. at 64.

Although even a single unwanted kiss could, depending on the circumstances, "seriously poison the victim's working environment," EEOC, Policy Guidance on Current Issues of Sexual Harassment, 1990 WL 1016516, *10 (Mar. 19, 1990) ("If an employee's supervisor sexually touches that employee, the Commission normally would find a violation" of Title VII.), not every kiss will create an objectively hostile work environment. See, e.g., Saxton v. Am. Tel. & Tel. Co., 10 F.3d 526, 534 (7th Cir. 1993) (finding no sexual harassment where the defendant kissed and repeatedly touched the plaintiff); see generally Hostetler v. Quality Dining, Inc., 218 F.3d 798, 807-09 (7th Cir. 2000) (discussing acts of physical harassment generally and noting that while a "peck on the cheek" might not be actionable in and of itself, a "kiss on the lips" might be actionable, even in isolation).  Kisses, as with all alleged acts of harassment, must be evaluated in context and in conjunction with the totality of the circumstances.  See Breeden, 121 S.Ct. at 1510; Meritor

<u>Savs. Bank</u>, 477 U.S. at 69.

It is clear that Russ' actions, when viewed in context, go beyond "ordinary socializing in the workplace."  <u>See</u> <u>Oncale</u>, 523 U.S. at 1003 (Ginsburg, J., concurring).  Thus, I conclude that a reasonable jury could find that being kissed on the neck almost every day by a superior officer, in advance of a promotional interview in which that superior officer plays an important role, creates an objectively hostile work environment that alters the terms or conditions of the victim's employment.  <u>See</u> <u>Harris</u>, 510 U.S. at 23.  Accordingly, I proceed to address the merits of the City's affirmative defense.

### (i). <u>The Affirmative Defense</u>

In <u>Burlington Industries</u>, the Supreme Court held:

> An employer is subject to vicarious liability
> to a victimized employee for an actionable
> hostile environment created by a supervisor
> with immediate (or successively higher) authority
> over the employee.  When no <u>tangible employment
> action</u> is taken, a defending employer may raise
> an affirmative defense to liability or damages,
> subject to proof by a preponderance of the
> evidence.

524 U.S. at 765 (emphasis added).  Thus, the affirmative defense is available to an employer only when no tangible employment action has been taken against an employee.  <u>Id.</u>

-57-

The City does not dispute that a failure to promote constitutes a tangible employment action. Id. at 761. It contends, however, that Truax has neither pled nor proven that the City based its decision not to promote Truax on her refusal to submit to Russ' advances. Therefore, the City argues, it may avail itself of the affirmative defense. See Frederick v. Sprint/United Mgmt. Co., 246 F.3d 1305, 1312 (11th Cir. 2001) (affirming grant of summary judgment for the employer where the plaintiff "failed to present sufficient evidence to establish any causal link between the adverse 'tangible employment action' she suffered and the alleged harassment"); see also Farragher, 524 U.S. at 808 ("No affirmative defense is available . . . where the supervisor's harassment culminates in a tangible employment action.") (emphasis added).

I need not address this argument, however, because Truax asserts that the harassment she endured culminated in her constructive discharge. The City contests neither the validity of Truax's constructive discharge claim nor whether that claim constitutes a tangible employment action for purposes of the affirmative defense. See generally Elmasry v. Veith, 2000 DNH 005, 10-15 (collecting cases, discussing the split of authority,

and holding that, under certain circumstances not present in that case, a constructive discharge may constitute a tangible employment action). Because a finding of constructive discharge could potentially negate the availability of the <u>Burlington Industries</u> affirmative defense, I deny the City's motion for summary judgment.

**4.  Retaliation**

Truax and Johnson allege that the City retaliated against them for reporting discriminatory conduct. <u>See</u> 42 U.S.C. § 2000e-3(a) (making it unlawful to retaliate against an employee because she has opposed any practice that is unlawful under Title VII or because she "has made a charge . . . or participated in any manner in an investigation, proceeding, or hearing" pursuant to Title VII). In response, the City argues that neither Truax nor Johnson have set forth facts which establish a causal connection between their protected activities and the adverse employment actions taken against them.

I address Truax and Johnson's claims in turn, using the familiar <u>McDonnell Douglas</u> burden-shifting framework.

### a.  **Truax's Claim**

Truax asserts that the City refused to promote her in retaliation for her decision to lodge a complaint against Commissioner Mahoney in 1995.

To establish a prima facie case of retaliation, Truax must show by a preponderance of the evidence that: (1) she engaged in conduct protected by Title VII; (2) she suffered an adverse employment action; and (3) the adverse action is causally connected to the protected activity.  See White v. New Hampshire Dept. of Corrs., 221 F.3d 254, 262 (1st Cir. 2000) (quoting Hernandez-Torres v. Intercontinental Trading, Inc., 158 F.3d 43, 47 (1st Cir. 1998)); Santiago-Ramos, 217 F.3d at 57.  If Truax establishes her prima facie case, the burden of production shifts to the City, who must respond by articulating a nondiscriminatory reason for the adverse employment action.  See King v. Town of Hanover, 116 F.3d 965, 968 (1st Cir. 1997).  If the City meets its burden of production, the presumption of retaliation falls away and Truax must prove that the City's explanation is actually a pretext for retaliation.  See id.

Truax claims that the City refused to promote her in 1998 because she lodged a complaint against Commissioner Mahoney in

1995, in response to his comment about "broads" in the FBI. Even assuming that Truax's complaint qualifies as protected activity under Title VII, Truax fails to "point to evidence in the record that would permit a rational factfinder to conclude that" the City decided not to promote her in retaliation for her actions. King, 116 F.3d at 968; see Breeden, 121 S.Ct. at 1511 (holding that a twenty month gap between a plaintiff's protected activity and the adverse employment action taken against her does not support a finding of causation); Hoeppner v. Crotched Mountain Rehab. Ctr., Inc., 31 F.3d 9, 14 (1st Cir. 1994). Accordingly, I grant the City's motion for summary judgment with regard to this claim. See King, 116 F.3d at 968.

b. **Johnson's Claim**

Johnson clearly establishes the first two elements of her prima facie case. First, Johnson engaged in protected activity when she filed her charge of discrimination with the NHCHR and when she filed her initial complaint with this court. See 42 U.S.C. § 2000e-3(a). Second, Johnson was discharged, and the City refused to reinstate her after Arbitrator Pinkus' award in her favor. The former is clearly an adverse employment action, and I assume for purposes of discussion that the latter is as

well.  See Hernandez-Torres, 158 F.3d at 47.

In order to complete her prima facie case, and survive the City's motion for summary judgment, Johnson must "point to evidence in the record that would permit a rational factfinder to conclude that the employment action was retaliatory."  King, 116 F.3d at 968; see Hoeppner, 31 F.3d at 14.  Although Johnson fails to point to any evidence suggesting such a causal connection, I note that the record reveals that she filed her charge with the NHCHR on June 30, 1999, and that she was discharged on September 23, 1999.  See Oliver, 846 F.2d at 110 ("A showing of discharge soon after the employee engages in [protected activity] is indirect proof of a causal connection . . . because it is strongly suggestive of retaliation.").  Given the relatively modest nature of the prima facie case, this temporal proximity is sufficient to establish a causal connection between Johnson's protected activity and the adverse employment actions taken by the City.  See Wyatt v. City of Boston, 35 F.3d 13, 16 (1st Cir. 1994) ("One way of showing causation is by establishing that the employer's knowledge of the protected activity was close in time to the employer's adverse action."); see also Breeden, 121 S.Ct. at 1511; Beliveau v. United States Dept. of Labor, 170 F.3d 83,

-62-

87 (1st Cir. 1999). Thus, the burden of production shifts to the City.

As discussed with regard to Johnson's disparate treatment claim, the City has articulated a legitimate non-discriminatory reason for Johnson's discharge, namely, that she was discharged because of her conduct during the Market Square incident on June 18, 1999 and her history of disciplinary problems. See, e.g., Mortimer Aff. at ¶ 10; Mahoney Aff. at ¶¶ 10-11 and attached Commission Decision. The City further asserts that it did not reinstate Johnson because it is appealing the arbitrator's decision in state court and that it remains concerned with "Johnson's relationship with the other police officers, her relationship with the public and with her general suitability to fulfill the duties of an armed police officer." Mahoney Aff. at ¶ 14.

Johnson, however, fails to offer any relevant evidence, other than the temporal proximity between her protected activity and the City's actions, on the ultimate issue of whether the City's articulated reasons were a mere pretext for retaliation.[20]

_____

[20] Johnson's allegation that someone placed a portion of her personnel file in the Portsmouth library while her grievance

See King, 116 F.3d at 968 ("It is insufficient for [the plaintiff] to simply recount that he complained and that he was disciplined five months later. He must offer sufficient evidence of discrimination for a rational factfinder to find in his favor."). The probative value of this temporal proximity is tempered by the fact that at the time Johnson filed her charge with the NHCHR she was already on leave pending an investigation of the Market Square incident. Cf. Breeden, 121 S.Ct. at 1511 ("Employers need not suspend previously planned transfers upon discovering that a Title VII suit has been filed, and their proceeding along lines previously contemplated, though not yet definitively determined, is no evidence whatever of causality."). Johnson's failure to offer additional evidence of retaliation is fatal, and compels me to grant the City's motion for summary judgment with regard to this claim. See, e.g., Santiago-Ramos, 217 F.3d at 57-58; King, 116 F.3d at 968; Hoeppner, 31 F.3d at 17.

B.   **The Section 1983 Claims**

In Count II of their Second Amended Complaint, Truax and

---

was still pending sheds little, if any, light on whether the Department's decisions were retaliatory.

Johnson invoke 42 U.S.C. § 1983 as a vehicle for their First and Fourteenth Amendment claims.[21] Truax and Johnson allege that defendants, while acting under color of state law, violated the Fourteenth Amendment's Equal Protection Clause by: (1) initially refusing to promote Truax to Captain because she is a woman; (2) discharging Johnson because she is a woman; (3) creating a hostile work environment towards women at the Department; and (4) removing Truax from her OJJDP duties because she refused Russ' sexual advances. Second, Truax and Johnson allege that defendants, while acting under color of state law, violated the First Amendment by discharging Johnson, and initially refusing to promote Truax, in retaliation for their decision to report acts

_____

[21] Truax and Johnson also invoke Section 1983 as an independent basis for their Title VII claims. Section 1983, however, does not provide a remedy for statutory violations where Congress, in enacting a statute, has indicated an intent to preclude the use of Section 1983 as an enforcement mechanism. See Middlesex County Sewerage Auth. v. Nat'l Sea Clamers Ass'n, 453 U.S. 1, 19-20 (1981). Because I agree with those circuit courts that have held that Title VII has its own detailed and comprehensive remedial scheme, I conclude that it provides the exclusive remedy for employment discrimination actions based solely on its violation. See Polson v. Davis, 895 F.2d 705, 710 (10th Cir. 1990); Foster v. Wyrick, 823 F.2d 218, 221-22 (8th Cir. 1987); Day v. Wayne County Bd. of Auditors, 749 F.2d 1199, 1204 (6th Cir. 1984); Irby v. Sullivan, 737 F.2d 1418, 1428-29 (5th Cir. 1984). Accordingly, I grant defendants' motion for summary judgment with respect to this portion of Count II.

of discrimination within the Department.

Defendants move for summary judgment on both sets of claims. In addition, Mahoney, Mortimer, and Devine assert that they are entitled to qualified immunity. As discussed below, I grant defendants' motion in part and deny it in part.

I begin my analysis by noting that Truax and Johnson's Section 1983 claims are subject to New Hampshire's three-year statute of limitations for personal injury actions, N.H. Rev. Stat. Ann. 508:4, I. See Wilson v. Garcia, 471 U.S. 261, 276-80 (1985); Calero-Colon v. Betancourt-Lebron, 68 F.3d 1, 2 (1st Cir. 1995) ("The limitation period governing personal injury actions under the law of the forum state is borrowed for application to section 1983 claims."). This three-year limitations period is longer than the limitations period, discussed above, governing Truax and Johnson's Title VII claims. This difference in limitations periods does not alter the factual foundation of Truax and Johnson's claims, however, because they point to no evidence which, although time-barred for purposes of Title VII, might give rise to liability for purposes of Section 1983.[22]

---

[22] Although the City does not advance this argument in its motion for summary judgment, I note that the City "cannot be held

## 1. **Equal Protection Claims**

The Equal Protection Clause of the Fourteenth Amendment provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws." "To prove a violation of the [E]qual [P]rotection [C]lause, a plaintiff must show that the defendant acted with discriminatory intent." Lipsett, 864 F.2d at 896. The First Circuit generally analyzes employment discrimination claims brought under the Equal Protection Clause using the same framework that it employs when analyzing disparate treatment and sexual harassment claims under Title VII. Id. at 896-98 (discussing disparate treatment and sexual harassment claims); see Pontarelli v. Stone, 930 F.2d 104,

---

liable under a respondeat superior theory." Fletcher v. Town of Clinton, 196 F.3d 41, 55 (1st Cir. 1999) (citing Monell v. Dept. of Social Servs., 445 U.S. 622, 657 (1980)). "This means that even if the individual defendants are liable, [the City] may not be." Id. In order to impose liability on the City pursuant to Section 1983, Truax and Johnson must demonstrate: (1) that "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by [the municipality's] officers or is pursuant to governmental custom even though such a custom has not received formal approval through the body's official decisionmaking channels;" and (2) "a direct causal link between the municipal action and the deprivation of federal rights." Id. (internal quotation marks and citations omitted); see also Silva v. Worden, 130 F.3d 26, 30-32 (1st Cir. 1997).

113-14 (1st Cir. 1991).

Accordingly, because I have already analyzed Truax and Johnson's Title VII claims, and because they offer no additional evidence in support of their identical equal protection claims, I need not re-analyze their allegations under the Equal Protection Clause. Therefore, based on my analysis above, I grant defendants' motion for summary judgment with regard to Johnson's disparate treatment and sexual harassment claims. Because Truax has demonstrated that genuine questions of material fact exist as to whether the City initially refused to promote her because of her sex and whether she experienced hostile work environment sexual harassment, I deny defendants' motion for summary judgment with regard to Truax's equal protection claims based on disparate treatment and hostile work environment sexual harassment.

### a. Qualified Immunity

Commissioners Mahoney, Mortimer, and Devine contend that they are entitled to qualified immunity with regard to Truax's disparate treatment claim. See Roldan-Plumey v. Cerezo-Suarez, 115 F.3d 58, 65 (1st Cir. 1997) (discussing qualified immunity). The First Circuit has made it clear, however, that "defendants normally are denied the pretrial benefits of an immunity defense

-68-

where, as here, the court finds trialworthy issues pertaining to their subjective state of mind, i.e., discriminatory intent." Carter v. Rhode Island, 68 F.3d 9, 10 n.2 (1st Cir. 1995); see Swain v. Spinney, 117 F.3d 1, 9 (1st Cir. 1997) (holding that a qualified immunity determination "may not be resolved on a motion for summary judgement when material facts are substantially in dispute"). Accordingly, I reject the Commissioners' argument.

2. **First Amendment Claims**

Truax and Johnson allege that defendants violated their rights under the First Amendment by: (1) discharging Johnson in retaliation for her decisions to report acts of discrimination in the Department and to file a charge with the NHCHR; and (2) initially refusing to promote Truax in retaliation for her decision to lodge a complaint against Commissioner Mahoney. Defendants move for summary judgment on both claims.

In order to establish a prima facie case of First Amendment retaliation, Truax and Johnson must each show that: (1) they engaged in constitutionally protected conduct; and (2) this conduct was a "substantial or motivating factor for the adverse employment decision." Padilla-Garcia v. Guillermo Rodriguez, 212 F.3d 69, 74 (1st Cir. 2000); see Wytrwal v. Saco Sch. Bd., 70

F.3d 165, 170 (1st Cir. 1995). If Truax and Johnson establish a prima facie case, the defendants may attempt to show that they would have taken the same adverse employment actions regardless of Truax and Johnson's sex. Padilla-Garcia, 212 F.3d at 74 (citing Mt. Healthy City Sch. Dist. Bd. of Ed. v. Doyle, 429 U.S. 274, 287 (1977)).

As discussed above with regard to Johnson's Title VII claim, the only evidence of retaliatory intent that Johnson offers is the temporal proximity between her discharge and the filing of her claim with the NHCHR. Moreover, as discussed above, defendants offer substantial evidence supporting their position that they decided to discharge Johnson because of her long history of disciplinary infractions, culminating with the Market Square incident. Accordingly, I grant defendants' motion for summary judgment with regard to this claim. See Padilla-Garcia, 212 F.3d at 74.

Truax, however, cannot even rely on temporal proximity as evidence of retaliatory intent. As discussed above, she offers no evidence suggesting a connection between her decision to lodge a complaint against Mahoney in 1995 and the City's initial decision not to promote her in 1998. Accordingly, I grant

defendants' motion for summary judgment with regard to this claim.  See <u>Padilla-Garcia</u>, 212 F.3d at 74.

## C.    <u>Summary</u>

Defendants did not move for summary judgment with regard to: (1) Truax's Title VII claims against the City for constructive discharge and retaliatory constructive discharge; (2) Truax's Section 1983 claims against all of the defendants for (a) constructive discharge, in violation of her rights under the Equal Protection Clause, and (b) retaliatory constructive discharge, in violation of her rights under the First Amendment; and (3) Truax's claim against the City and Russ for constructive discharge.  Accordingly, those claims remain.

As discussed herein, I grant defendants' motion for summary judgment in part and deny it in part.  I grant the motion with regard to all claims asserted by Johnson.  I grant the motion with regard to all of Truax's challenged claims, <u>except</u> for: (1) her Title VII claims against the City for disparate treatment and hostile work environment sexual harassment; and (2) her Section 1983 claims against all of the defendants for disparate treatment and hostile work environment sexual harassment, in violation of her rights under the Equal Protection Clause.

## IV.  CONCLUSION

For the reasons discussed above, I grant defendants' motion for summary judgment, (Doc. No. 14), in part and deny it in part.

SO ORDERED.

_____
Paul Barbadoro
Chief Judge

June 18, 2001

cc:  David P. Slawsky, Esq.
     William G. Scott, Esq.